4 F.3d 1137
 62 USLW 2180, 17 Employee Benefits Ca 1521
 Leonard GILLIS, for themselves and all others similarly
situated, as a class; Valdo A. Sargeni, for
themselves and all others similarly
situated, as a class;
v.
HOECHST CELANESE CORPORATION; Hoechst Celanese Retirement
Plan, a federal employee pension benefit plan and
trust, Third-Party Plaintiffs,
v.
AMERICAN MIRREX CORPORATION, a Delaware Corporation;
American Mirrex Retirement Plan, a federal
employee benefit plan and trust,
Third-Party Defendants.
Leonard Gillis and Valdo Sargeni, for themselves and all
others similarly situated, Appellants.
 No. 92-1879.
 United States Court of Appeals,
Third Circuit.
 Argued May 17, 1993.
Decided Sept. 7, 1993.
Sur Petition for Rehearing Oct. 6, 1993.
 
 Kent Cprek (argued), Sagot, Jennings & Sigmond, Philadelphia, PA, for appellants.
 Laurence Z. Shiekman, Eleanor N. Ewing, Marc R. Garber, Brian T. Ortelere, Barbara W. Mather (argued), Pepper, Hamilton & Scheetz, Philadelphia, PA, for appellees.
 Before: STAPELTON, ALITO and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Leonard Gillis and Valdo Sargeni ("plaintiffs") are former employees of the Hoechst Celanese Corporation ("Hoechst"). They allege that Hoechst and the Hoechst Celanese Retirement Plan ("Hoechst Retirement Plan") have failed to comply with certain provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Secs. 1001-1461. They also advance two state law claims.
 
 
 2
 The district court had jurisdiction over the ERISA claims under 29 U.S.C. Sec. 1132 and jurisdiction over the state law claims under 28 U.S.C. Sec. 1367(a). We have jurisdiction over plaintiffs' appeal from a final order of the district court pursuant to 28 U.S.C. Sec. 1291.[1]I. BACKGROUND
 
 
 3
 Hoechst sold its PVC Division in Delaware City, Delaware to the American Mirrex Corporation ("American Mirrex") in 1989. It is not disputed that plaintiffs, who were employed in the PVC Division, have continued to work in their same positions for their new employer, American Mirrex.
 
 
 4
 In August of 1990, plaintiffs filed the complaint in this action advancing six separate claims arising from the sale. The district court granted plaintiffs' request for certification as class representatives for their claim under ERISA that Hoechst improperly denied them severance pay and their state law claim that Hoechst improperly denied them vacation pay. The district court denied plaintiffs' request for certification as class representatives for their claim under ERISA that Hoechst and the Hoechst Retirement Plan (collectively "defendants") failed to transfer sufficient funding to the American Mirrex Retirement Plan to fund their early retirement benefits and for their claim that defendants should be penalized for reporting and disclosure violations of ERISA.[2] Each plaintiff brought one of the two remaining claims in his individual capacity.
 
 
 5
 Plaintiff Sargeni alleged that Hoechst breached a contractual obligation to provide him with counseling concerning his benefit options at the time it sold the PVC Division. Plaintiff Gillis contended that Hoechst violated ERISA by failing to give him seniority credit for two years that he worked at a Hoechst plant in Canada.
 
 
 6
 In June of 1992, defendants filed a motion seeking summary judgment or dismissal of all claims. The district court issued a memorandum and order granting summary judgment for defendants on all claims except the vacation pay claim and the breach of contract claim which were both based on state law. It dismissed those claims for lack of subject matter jurisdiction. It also denied plaintiffs' motion for partial summary judgment. Plaintiffs then filed this timely appeal.
 
 II. DISCUSSION
 
 7
 On this appeal from a grant of summary judgment, "[t]he non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In addition, "[i]nferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." Id. Our review is plenary. Id.
 
 
 8
 We turn first to a review of that portion of the district court's order granting summary judgment for defendants.
 
 A. Claims Disposed of By Summary Judgment
 1. Severance Benefits
 
 9
 Simply stated, plaintiffs argue that their employment with Hoechst was "severed" when the PVC Division was sold and, therefore, they are entitled to severance pay. Hoechst's Corporate Human Resource Department ("the Department") denied plaintiffs' request for severance pay and the district court granted summary judgment for Hoechst on this claim after concluding that the Department's denial was not arbitrary or capricious.
 
 
 10
 As a threshold matter, we must consider plaintiffs' argument that the district court erred when granting summary judgment by relying upon a document identified by Hoechst as the Hoechst Celanese Separation Pay Policy. Plaintiffs allege that this document was fabricated by Hoechst after the date on which plaintiffs requested severance pay. The authenticity of this document is important for two reasons. First, the district court relied on the document when determining the eligibility requirements for severance pay. Second, the district court also relied on this document when determining the degree of scrutiny with which it reviewed the decision by the Department to deny these benefits. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (holding that a court should review a plan administrator's denial of benefits under a de novo standard unless the plan grants the administrator discretion when making eligibility decisions, in which case an arbitrary and capricious standard applies).
 
 
 11
 Because plaintiffs have no direct evidence that the document was fabricated after-the-fact, they rely exclusively on circumstantial evidence. Plaintiffs first assert that the document was not distributed to the employees at the PVC Division and was not produced until after they made their claim for severance pay. Indeed, defendants concede, as they must, that "[t]here is, in the record below, an admitted failure to supply a copy of the [separation pay] plan on a timely basis to the plaintiffs." (Tr. of oral argument at 32). However, standing alone, the fact that the separation pay policy document was not distributed to the employees is "irrelevant in determining entitlement to benefits." Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).
 
 
 12
 Plaintiffs also note that the document pre-dates the Supreme Court's decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and yet utilizes the "arbitrary and capricious" standard which was adopted by the Bruch Court. However, use of the arbitrary and capricious standard was not uncommon in the years before Bruch was decided. See Bruch, 489 U.S. at 107, 109 S.Ct. at 952 (stating that, at the time Bruch was decided, "most federal courts [were] review[ing] the denial of benefits by ERISA fiduciaries and administrators under the arbitrary and capricious standard").
 
 
 13
 We conclude that plaintiffs' circumstantial evidence is insufficient to create a genuine issue of material fact as to the authenticity of the separation pay policy document produced by Hoechst. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52, 106 S.Ct. 2505, 2509-12, 91 L.Ed.2d 202 (1986). Accordingly, we turn to a review of the terms of that document.
 
 
 14
 The Hoechst Celanese Separation Pay Policy contains the following provision:
 
 Administration and Interpretation
 
 15
 The Corporate Human Resources Department is responsible for administering this policy, issuing procedures and local guidelines, and handling any questions of policy interpretation, as well as determining the rights of any person to benefits under this policy. The decisions of the Corporate Human Resources Department shall be binding unless arbitrary and capricious.
 
 
 16
 (J.A. at 2708).
 
 
 17
 Under this provision, the Department was given discretion to interpret the terms of the separation pay policy when making eligibility determinations. Consequently, we apply the arbitrary and capricious standard when reviewing the Department's determination to deny plaintiffs' request for benefits. See Bruch, 489 U.S. 101, 109 S.Ct. 948; Stoetzner v. United States Steel Corp., 897 F.2d 115, 119 (3d Cir.1990) ("[T]he arbitrary and capricious standard [applies] because the plan contains provisions which give[ ] the administrator discretion in making eligibility determinations.").
 
 
 18
 We have explained that when the arbitrary and capricious standard applies the decisionmaker's determination to deny benefits must be upheld unless it was "clear error" or not "rational." Shiffler v. Equitable Life Assurance Soc'y, 838 F.2d 78, 83 (3d Cir.1988). To determine whether the Department's denial of plaintiffs' benefits was irrational or clearly erroneous here, we turn to an examination of the pertinent separation pay policy provisions governing eligibility.
 
 
 19
 The Hoechst Celanese Separation Pay Policy states:
 
 1. Policy
 
 20
 It is the policy of Hoechst ... to provide separation pay to eligible employees resulting from certain types of involuntary terminations of employment....2.1 Eligibility
 
 
 21
 All regular, full-time, salaried employees ... who are involuntarily terminated from active employment due to
 
 
 22
 . . . . .
 
 
 23
 --sale of all or part of a business (where the acquiring or purchasing company does not offer continued employment)
 
 
 24
 . . . . .
 
 
 25
 are eligible for separation pay.
 
 
 26
 2.2 All regular, full time, salaried employees who are terminated by reason of
 
 
 27
 . . . . .
 
 
 28
 --any other reason not specified in 2.1 are ineligible for separation pay.
 
 
 29
 (J.A. at 3145) (bolding added, italics in original). In light of the parenthetical exclusion within section 2.1, it appears that Hoechst intended to deny severance pay to any employees who were offered continued employment with the purchasing company when the division in which they worked was sold. Thus, the Department's decision to deny severance benefits to plaintiffs does not appear to have been irrational or clearly erroneous. Nevertheless, plaintiffs argue that summary judgment was unwarranted for several reasons.
 
 
 30
 First, plaintiffs argue that they are entitled to severance benefits under certain documents other than the separation pay policy document discussed above. One document plaintiffs seek to rely upon is a 1986 Agreement of Merger between the companies that combined to form Hoechst. However, even if we assumed that this merger agreement could alter or override the separation pay policy discussed earlier, it did not provide severance pay for any employees who left employment after February of 1989--months before plaintiffs ceased working for Hoechst. (J.A. at 3439).
 
 
 31
 Plaintiffs also seek to rely upon "VALUES" brochures which Hoechst distributed to its employees.[3] However, as the district court noted, the VALUES booklets contained the following disclaimer:
 
 
 32
 This booklet summarizes certain plan documents and contracts. If there is a difference between this booklet and the documents or contracts, then the documents and contracts will govern....
 
 
 33
 (J.A. at 3393); see Gillis v. Hoechst Celanese Corp., 818 F.Supp. 805, 809 (E.D.Pa.1992). In light of this disclaimer, we conclude that, under ERISA, these documents were, at most, summary plan descriptions. Accordingly, the plan document (i.e., the separation pay policy document) controls and the plaintiffs "cannot recover under 29 U.S.C. Sec. 1132(a)(1)(B) [of ERISA] for benefits allegedly due under a summary plan description." Gridley, 924 F.2d at 1318.
 
 
 34
 Finally, plaintiffs argue that Hoechst is equitably estopped from denying them severance benefits. When a plaintiff asserts an equitable estoppel claim based on an ERISA reporting and disclosure violation, the plaintiff must satisfy more than simply the "ordinary elements" of equitable estoppel. Gridley, 924 F.2d at 1319.[4] As we stated when rejecting a similar claim: "Our precedents indicate that an ERISA reporting or disclosure violation ... cannot provide a basis for equitable estoppel ... in the absence of 'extraordinary circumstances.' " Id. Plaintiffs, who were offered and accepted employment with American Mirrex, failed to introduce evidence that they were victims of "extraordinary circumstances." Indeed, just as in Gridley, "the present case does not even satisfy the ordinary elements of the doctrine of equitable estoppel" because plaintiffs failed to introduce any evidence that they relied upon their expectation of severance pay. Thus, plaintiffs have failed to introduce sufficient evidence to withstand summary judgment on this claim.
 
 
 35
 In view of the foregoing analysis, we conclude that the district court properly granted summary judgment for defendants on the plaintiffs' class action claim for severance benefits.
 
 2. Early Retirement Benefits
 
 36
 Plaintiffs argue that Hoechst underfunded the American Mirrex Plan in violation of 29 U.S.C. Sec. 1058, because Hoechst allegedly failed to transfer sufficient assets to fund plaintiffs' early retirement benefits. Hoechst counters that "ERISA does not protect or regulate these benefits for plaintiffs" and, "[a]s a matter of law, therefore, plaintiffs have no claim for underfunding or even for outright elimination of this benefit." (Defs.' Brief at 17). The district court concluded that plaintiffs' right to early retirement benefits is not protected by ERISA because neither plaintiff satisfied the eligibility requirements for early retirement at the time the PVC Division was sold.
 
 
 37
 To be eligible for early retirement benefits under the Hoechst Retirement Plan, the sum of an employee's age and years of service for the plan sponsor must be at least 85 (e.g., 55 years of age with 30 years of service). It is undisputed that neither plaintiff qualified for early retirement under this so-called "rule of 85" on the date that Hoechst sold the PVC Division to American Mirrex. Nevertheless, plaintiffs argue that ERISA protects their right to qualify for early retirement benefits under the Hoechst Retirement Plan at some point in the future. As a corollary to this argument, plaintiffs contend that defendants must credit their years of service with their new employer, American Mirrex, in determining whether they satisfy the rule of 85. Plaintiffs thus raise an important issue that has not yet been decided by this court.
 
 
 38
 We turn to a review of that portion of the district court's order which granted summary judgment for defendants on this claim for early retirement benefits. Our review begins with an examination of ERISA and an application of the pertinent sections of that statute to the undisputed material facts on which this claim is based.
 
 
 39
 ERISA was enacted, in part, "to protect ... the interests of participants in employee benefit plans...." 29 U.S.C. Sec. 1001(b). Congress was concerned that "many employees with long years of employment [were] losing anticipated retirement benefits" because of the inadequate funding of pension plans. Id. Sec. 1001(a). Consequently, although ERISA does not require employers to provide pension benefits, it does mandate certain minimum standards (i.e., funding, vesting and participation) for plans which employers voluntarily establish for their employees. See, e.g., 29 U.S.C. Sec. 1053.
 
 
 40
 Prior to 1984, ERISA did not protect early-retirement benefits. See Gluck v. Unisys Corp., 960 F.2d 1168, 1185 (3d Cir.1992) ("ERISA permitted the reduction of early retirement benefits prior to July 31, 1984, but not after."). In 1984, however, Congress amended ERISA by enacting the Retirement Equity Act of 1984 ("REA"), Pub.L. No. 98-397, 98 Stat. 1426 (1984). The REA amended Section 204(g) of ERISA to protect early retirement benefits under certain circumstances. Therefore, our inquiry into whether ERISA protects plaintiffs' right to early retirement benefits must begin with an examination of the language of Section 204(g). See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself.").
 
 As amended, Section 204(g) states:
 
 41
 (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.
 
 
 42
 (2) For purposes of paragraph (1), a plan amendment which has the effect of--
 
 
 43
 (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
 
 
 44
 (B) eliminating an optional form of benefit,
 
 
 45
 with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy....
 
 
 46
 29 U.S.C. Sec. 1054(g).
 
 
 47
 Subsection (g)(1), sets forth a general prohibition against plan amendments which reduce accrued benefits. Subsection (g)(2) provides that, under certain circumstances, a plan amendment which reduces early retirement benefits is to be treated as an amendment prohibited by subsection (g)(1)--i.e., as a plan amendment which reduces accrued benefits. We turn to the parties' contentions on whether defendants violated this section.
 
 
 48
 Plaintiffs argue that defendants' stated position that plaintiffs are not entitled to early retirement benefits under the Hoechst Retirement Plan is tantamount to an "amendment" of the Hoechst Retirement Plan as that term is used in Section 204(g). Plaintiffs then argue that Section 204(g)(2) prohibits such amendments unless defendants give plaintiffs the opportunity "after the amendment" to satisfy "the preamendment conditions" for early retirement benefits. 29 U.S.C. Sec. 1054(g)(2).
 
 
 49
 Plaintiffs' interpretation of Section 204(g) is entirely plausible. However, if we were to confine our inquiry strictly to the statutory language, we could not say that it was the only possible interpretation of the statute. Indeed, plaintiffs concede that the statutory language is "somewhat convoluted." (Pls.'s Brief at 25).
 
 
 50
 Defendants note that, by its terms, Section 204(g)(2) only prohibits a plan amendment which does away with early retirement benefits if there is the possibility that a participant could "satisf[y] (either before or after the amendment) the preamendment conditions for the subsidy." 29 U.S.C. Sec. 1054(g)(2). Defendants argue that plaintiffs do not fall within the class of persons who might satisfy the preamendment conditions (e.g. years of service for the plan sponsor) because they no longer work for Hoechst. Therefore, defendants argue, an amendment of the Hoechst Retirement Plan to eliminate plaintiffs' right to qualify for early retirement benefits is not prohibited by Section 204(g)(2).
 
 
 51
 Both plaintiffs' and defendants' arguments find some measure of support in the language of the statute. We conclude that the statutory language of Section 204(g), standing alone, fails to provide any clear answer to the issue before this court.[5] Accordingly, we turn to other sources to aid in interpreting this statutory provision.
 
 
 52
 If this case did not involve ERISA, at this point our inquiry might turn immediately to the statute's legislative history. See, e.g., Ardestani v. INS, --- U.S. ----, ----, 112 S.Ct. 515, 523, 116 L.Ed.2d 496 (1991) (resorting to legislative history is appropriate where meaning of statute is ambiguous); Connecticut Nat'l Bank v. Germain, --- U.S. ----, ----, 112 S.Ct. 1146, 1150, 117 L.Ed.2d 391 (1992) (Stevens, J., concurring) ("Whenever there is some uncertainty about the meaning of a statute, it is prudent to examine its legislative history."). When interpreting ERISA's provisions, however, we sometimes have the benefit of yet another source. Section 204(g), like many other sections of ERISA, has a mirror-like counterpart in the Internal Revenue Code ("IRC"). See 26 U.S.C. Sec. 411(d)(6).[6] Therefore, when interpreting Section 204(g) of ERISA, in addition to the statute's legislative history, we may also look for guidance to sources which interpret its IRC counterpart--Section 411(d)(6). See, e.g., Hoover v. Cumberland, Md. Area Teamsters Pension Fund, 756 F.2d 977, 981 (3d Cir.) (seeking guidance in interpreting ERISA Section 204(g) from an IRS Technical Information Release interpreting its IRC counterpart), cert. denied, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985); see also 29 U.S.C. Sec. 1202(c) (mandating that "[r]egulations prescribed by the Secretary of the Treasury under sections 410(a), 411, and 412 of [IRC] ... shall also apply to [their counterparts in ERISA]"). We turn to an examination of sources interpreting Section 411(d)(6) of the IRC.
 
 
 53
 The Internal Revenue Service ("IRS") has issued a Revenue Ruling which discusses the Section 411(d)(6) requirements for an employer who terminates an early retirement plan. See Rev.Rul. 85-6. In Revenue Ruling 85-6, the IRS considered whether such an employer is required to "set-aside" funds to provide early retirement benefits for its employees who might meet the age and service requirements for early retirement eligibility after the date on which the plan is terminated. The IRS stated:
 
 
 54
 A participant could, after the date of the proposed termination, satisfy the pretermination conditions necessary to receive [early retirement benefits]. Accordingly, the proposed termination eliminating this accrued retirement-type subsidy would result in the plan failing to satisfy ... Section 411. Further, all liabilities will not be satisfied ... if the value of this retirement-type subsidy is not provided with respect to a participant who, after the date of the proposed termination, satisfies the pretermination conditions necessary to receive such benefit. Until the liabilities for these benefits are satisfied, the employer may not recover any remaining funds as surplus resulting from actuarial error without disqualifying the plan.
 
 
 55
 Thus, the IRS takes the position that an employee can satisfy the eligibility requirements for early retirement benefits after the early retirement plan is terminated. For example, an employee could accumulate additional years of service if he continues to work for the employer after the plan is terminated. Therefore, when a plan terminates, an employer must provide funding for early retirement benefits if there is the possibility that its employees will "grow into" these benefits at a date after its early retirement plan is eliminated.
 
 
 56
 We give weight to IRS revenue rulings and do not disregard them unless they "conflict with the statute they purport to interpret or its legislative history, or if they are otherwise unreasonable." Geisinger Health Plan v. Commissioner, 985 F.2d 1210, 1216 (3d Cir.1993). Revenue Ruling 85-6 is reasonable and is entirely consistent with Section 204(g) of ERISA and Section 411(d)(6) of the IRC. It is also consistent with the legislative history of the REA.[7]
 
 
 57
 Based on the statutes, the revenue ruling and the legislative history, we would conclude that if Hoechst had continued to employ plaintiffs after terminating its early retirement plan, plaintiffs would be able to qualify for early retirement benefits at a later date by meeting the plan's pretermination requirements. We conceive of no obvious reason why this same result should not obtain when the employees continue in their same jobs for a successor employer. However, defendants argue that a sale of assets where the employees no longer continue to work for the plan sponsor is materially different from a plan termination where the employees continue to work for the plan sponsor. In short, defendants argue that "[s]ince [plaintiffs] no longer work for the plan sponsor, they cannot subsequently qualify for, or 'grow into,' the right to [early retirement benefits]." (Defs.' Brief at 17).
 
 
 58
 In support of their argument, defendants quote the following passage from the legislative history of Section 301 of the REA:
 
 
 59
 [Section 301] generally protects the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended and participants who subsequently meet the preamendment requirements. The bill does not, however, prevent the reduction of a subsidy in the case of a participant who, at the time of separation from service (whether before or after the plan amendment), has not met the preamendment requirements.
 
 
 60
 S.Rep. No. 575, 98th Cong., 2d Sess. 28 (1984), reprinted in, 1984 U.S.C.C.A.N. 2547, 2574. Defendants argue that plaintiffs were "separated from service" on the effective date of the sale of the PVC Division and, therefore, they can never accumulate the additional years of service which they would need to qualify for early retirement benefits under the Hoechst Retirement Plan.
 
 
 61
 Initially, we note that the "separated from service" language does not expressly appear in Section 204(g) of ERISA, nor does it appear in Section 411(d)(6) of the IRC. However, in interpreting neighboring sections of the IRC, the IRS has consistently taken the position that
 
 
 62
 an employee will be considered separated from service ... only upon the employee's death, retirement, resignation, or discharge, and not when the employee continues in the same job for a different employer as a result of liquidation, merger, consolidation, etc. of the former employer.
 
 
 63
 Rev.Rul. 79-336 (interpreting "separated from service" under IRC section 402); see Rev.Rul. 80-129 (same); Priv.Ltr.Rul. 86-14-048 (Jan. 9, 1986) ("[W]henever an employee follows the transfer of assets of a business to a new employer, no matter what the form takes, there is no separation from service unless the employee either immediately takes on new responsibilities at the new employer or actually separates from service by going to work for an unrelated business."); Gen.Couns.Mem. 39,384 (Jul. 18, 1985) (concluding that "separation from service" under IRC section 409 should be interpreted in the same way as that phrase is interpreted under IRC section 402).
 
 
 64
 At least one court has relied upon these IRS sources in concluding that employees who continue to work in their same jobs for a successor employer do not undergo a separation from service for the purpose of eligibility for early retirement benefits. See Hollingshead v. Burford Equip. Co., 809 F.Supp. 906, 917-18 (M.D.Ala.1992). The relevant facts in Hollingshead are virtually identical to the facts before this court. The first employer sold certain assets, including a manufacturing facility, to a successor employer. The plaintiffs in Hollingshead continued to work in their same positions for the successor employer. Id. at 916. They argued that, under Section 204(g) of ERISA, they should be able to become eligible for early retirement under the first employer's plan "even though they did not qualify for early retirement at the time the sale of assets occurred." Id.
 
 
 65
 Just as in this case, the first employer in Hollingshead argued that its liability ended with the asset sale and that it had no liability to anyone who had not met the requirements for early retirement at the time of the sale. Id. However, the Hollingshead court concluded that the plaintiffs had not undergone a separation from service with the first employer. Id. at 917-18. Rather, it concluded that "employees [of the first employer] who continue to work for [the successor employer] in the same job are allowed to 'grow into' their early retirement pension benefit while working for [the successor employer]." Id. at 918.
 
 
 66
 We agree with the reasoning of the Hollingshead court that an employee is not separated from service if the employee continues on in the same job for a successor employer. There is no dispute that plaintiffs continued in their same jobs for American Mirrex. Thus, we conclude that plaintiffs were not separated from service and they can continue to accumulate years of service while working for American Mirrex--the successor employer. Our conclusion is supported by the statutes, the IRS rulings and the legislative history of the REA. Our conclusion is also consistent with the IRS regulations that implement Section 411(d)(6). See 26 C.F.R. 1.411(d)-4 (Q & A 3) (1992) ("Section 411(d)(6) protected benefits may not be eliminated by reason of transfer or any transaction amending or having the effect of amending a plan or plans to transfer benefits."). In addition, our conclusion is consonant with the position taken by the IRS in at least one private letter ruling. See Priv.Let.Rul. 91-420-27 (Oct. 18, 1991) (rejecting argument that if "[n]one of the employees ... had 30 years of benefit service" then, "[i]n calculating the amount to be transferred ... the fully subsidized early retirement benefit after 30 years of benefit service does not have to be considered, because the employees ... will not be able to earn any further years of benefit service [after going to work for the successor employer]").
 
 
 67
 We reject defendants' argument that our conclusion conflicts with two of this court's earlier decisions. See Berger v. Edgewater Steel Co., 911 F.2d 911 (3d Cir.1990), cert. denied, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); Hlinka v. Bethlehem Steel Corp., 863 F.2d 279 (3d Cir.1988). Berger is easily distinguishable because all of the plaintiffs in that case had left their employment before meeting the requirements for early retirement. 911 F.2d at 915. Accordingly, there was a separation from service and no possibility that the employees would later meet the eligibility requirements for early retirement benefits. Hlinka is also distinguishable because that decision did not involve the application of Section 204(g) of ERISA. 863 F.2d at 284 n. 10.
 
 
 68
 We also recognize that two district courts interpreting Section 204(g) have reached a contrary conclusion. See Berard v. Royal Elec., Inc., 795 F.Supp. 519 (D.R.I.1992); Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc., No. 88 Civ. 1528, 1990 WL 422417 (S.D.N.Y.1990).[8] However, we find the reasoning employed by those courts unpersuasive. The Lear Siegler court quoted the same "separation from service" language that we discuss above. 1990 WL 422417, at * 12. However, it then implicitly concluded that an employee is separated from service when the facility where the employee works is sold to a new employer and the employee no longer works for the plan sponsor. Id. at * 12-14. The Berard court adopted the reasoning of the Lear Siegler court with little analysis of its own. As discussed above, we reject that reasoning.
 
 
 69
 We realize that, under ERISA, defendants can transfer their liability for early retirement benefits to the American Mirrex Retirement Plan. See 29 U.S.C. Sec. 1058. However, to transfer their liability for early retirement benefits, defendants must transfer sufficient assets to the American Mirrex Retirement Plan to fund those benefits. See 29 U.S.C. Sec. 1344(a)(6). We note that defendants contend that "the amount of funds transferred [to the American Mirrex Retirement Plan] was calculated to include the liability related to the 'Rule of 85' early retirement benefit." (Defs.' Brief at 14). However, as the district court correctly noted, whether defendants transferred sufficient assets to the American Mirrex Retirement Plan to fund the early retirement benefits is a disputed factual issue. See Gillis v. Hoechst Celanese Corp., 818 F.Supp. 805, 810 (E.D.Pa.1992). The consequence of the resolution of this disputed factual issue is a matter for the district court in the first instance.
 
 
 70
 In sum, we conclude that plaintiffs were not separated from service and, thus, they can continue to accumulate years of service while working for American Mirrex--the successor employer--to be counted towards qualifying for early retirement benefits. Accordingly, we will vacate that portion of the district court's order which granted summary judgment for defendants on this claim.
 
 
 71
 The district court refused to certify plaintiffs as class representatives on this claim based largely on its interpretation of Section 204(g) of ERISA. Because we have rejected that interpretation, we will also vacate the district court's order to the extent that it denies class certification and will remand that issue for reconsideration.
 
 3. Reporting and Disclosure Violations
 
 72
 Plaintiffs allege that defendants failed to comply with ERISA's reporting and disclosure requirements with respect to the Hoechst Retirement Plan and the Hoechst Celanese Separation Pay Policy. Plaintiffs sought an injunction ordering defendants to comply with these requirements and they also asked the district court to impose civil penalties against defendants. The district court assumed, without deciding, that defendants violated the reporting and disclosure requirements, but declined to grant the requested relief because it concluded that plaintiffs had not been harmed by any such nondisclosure. We turn to a review of the district court's conclusion.
 
 
 73
 Under ERISA, "[t]he [plan] administrator shall, upon written request of any participant or beneficiary, furnish a copy of [certain plan documents]." 29 U.S.C. Sec. 1024(b)(4). We see no statutory support for the district court's apparent conclusion that a plan participant must demonstrate harm in order to obtain an injunction requiring the plan administrator to comply with this disclosure provision. Our conclusion that harm need not be shown is supported by the Supreme Court's statement that "Congress' purpose in enacting the ERISA disclosure provisions [was to] ensur[e] that 'the individual participant knows exactly where he stands with respect to the plan.' " Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989) (quoting H.R.Rep. No. 93-533, 93rd Cong., 1st Sess. 11 (1973)). Thus, we conclude that ERISA does not require that harm be shown before a plan participant is entitled to an injunction ordering the plan administrator to comply with ERISA's reporting and disclosure requirements. To the extent that the district court may have believed otherwise we conclude that it erred. Accordingly, we cannot affirm the district court's grant of summary judgment on the reporting and disclosure claim on this basis.
 
 
 74
 As we stated earlier, the district court assumed, without deciding, that plaintiffs had standing to bring this claim and that defendants were guilty of reporting and disclosure violations. If, on remand, the district court decides these issues in plaintiffs' favor, it should then issue an injunction requiring the plan administrator to comply with ERISA's reporting and disclosure requirements. Whether the district court awards plaintiffs any monetary damages is a matter of discretion. See 29 U.S.C. Sec. 1132(c)(1). We flatly reject plaintiffs' argument that "[t]he $100-per-day penalty of 29 U.S.C. Sec. 1132(c)(1) must be imposed for failure to produce documents on request." (Pls.' Brief at 45) (emphasis added).
 
 
 75
 The district court also denied plaintiffs' request for class certification on this claim. However, at the time it denied the request for class certification, the court may have assumed that plaintiffs had no claim to benefits under the Hoechst Retirement Plan. Because, in light of our holding on the early retirement claim, such an assumption may be incorrect we will also vacate the portion of the district court's order which denied class certification and remand that issue for reconsideration.
 
 4. Seniority Claim
 
 76
 Plaintiff Gillis contended that, under ERISA, his seniority should be adjusted to include his two years of service at a plant in Canada owned by Hoechst. We think that in granting summary judgment for Hoechst the district court necessarily denied this claim.[9] However, the district court's opinion did not explain the basis for its decision in this regard. Thus, "the reason for summary judgment is [not] apparent on the record." Vadino v. A. Valey Eng'rs, 903 F.2d 253, 258 (3d Cir.1990). We are unable to determine whether the district court denied this claim because it concluded that it was waived or whether it denied the claim for reasons related to its merits. Accordingly, we lack "a reasoned basis on which to found our review." Id. In this case, our difficulty in reviewing the district court's decision was not alleviated by the briefing and oral argument on this appeal. Cf. id. at 259. Therefore, we will vacate the district court's order to the extent that it denies this claim and remand the claim so that the basis for the decision can be explicated by the district court and an appropriate order can be entered.
 
 B. Claims Disposed of By Dismissal
 
 77
 The district court certified plaintiffs as class representatives for their state law vacation pay claim. However, the district court subsequently dismissed the vacation claim after reasoning: "[B]ecause there is no longer a viable federal claim, there is no longer subject matter jurisdiction, and I must dismiss this matter." Gillis v. Hoechst Celanese Corp., 818 F.Supp. 805, 811 (E.D.Pa.1992). The district court applied this same reasoning when it dismissed Plaintiff Sargeni's state law claim that Hoechst breached a contractual obligation to provide him with counseling concerning his benefit options at the time it sold the PVC Division.
 
 
 78
 We express no opinion on whether the district court was correct in its legal analysis on this issue. Because we have reversed the district court's order to the extent that it grants summary judgment on the early retirement claim, the reporting and disclosure claim and the seniority claim, there are now viable federal claims. Accordingly, we will reverse the district court's order to the extent that it dismisses these two claims on that ground.
 
 III. CONCLUSION
 
 79
 The order of the district court will be vacated to the extent that it grants summary judgment for defendants on the early retirement benefits funding claim and the reporting and disclosure claim and to the extent that it denies class certification on those claims. The order of the district court will also be vacated to the extent that it grants summary judgment for Hoechst on the seniority claim. In addition, the order of the district court will also be vacated to the extent that it dismisses the vacation pay claim and the breach of contract claim based on lack of subject matter jurisdiction. The remainder of the district court's order will be affirmed.
 
 ALITO, Circuit Judge, concurring:
 
 80
 I join the opinion of the court, but I write separately to highlight my understanding of the question concerning early retirement benefits that is before us and the reasons why the district court's decision with respect to this question was incorrect.
 
 
 81
 The plaintiffs acknowledge that their current employer's retirement plan (the American Mirrex Retirement Plan) states that they are to receive the same early retirement benefits subject to the same conditions as their previous plan (the Hoechst Celanese Retirement Plan). The plaintiffs argue, however, that Hoechst Celanese, in violation of Section 208 of ERISA, 29 U.S.C. Sec. 1058, and Section 414(l ) of the Internal Revenue Code, 26 U.S.C. Sec. 414(l ), failed, upon selling the division in which they worked, to transfer to the American Mirrex Plan sufficient assets to fund their early retirement benefits.
 
 
 82
 Section 208 of ERISA, 29 U.S.C. Sec. 1058, states in pertinent part:
 
 
 83
 A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).
 
 
 84
 In a similar vein, Section 414(l ) of the Internal Revenue Code, 26 U.S.C. Sec. 414(l ), provides that a plan is not "qualified" unless the same requirements are met. Thus, both provisions require us to compare (a) the benefits, if any, that the plaintiffs would have received if the Hoechst Celanese Plan had terminated just before the transfer of assets with (b) the benefits, if any, that the plaintiffs would have received if the American Mirrex Plan had terminated just after the transfer.
 
 
 85
 In order to determine the benefits that the plaintiffs would have received upon termination of the plans at these two points in time, it is necessary to look to Section 4044 of ERISA, 29 U.S.C. Sec. 1344, which prescribes the order in which the assets of a single-employer defined benefit plan are allocated among participants and beneficiaries at termination. The effect of all of these provisions--26 U.S.C. Sec. 414(l ) and 29 U.S.C. Secs. 1058 and 1344--when read together was to require that any allocation of assets to the plaintiffs' early retirement benefits that would have occurred upon termination of the Hoechst Celanese Plan just before the transfer not exceed the allocation of assets to those benefits that would have occurred upon termination of the American Mirrex Plan just after the transfer.
 
 
 86
 In order to determine what allocation, if any, would have been made to the plaintiffs' early retirement benefits if the Hoechst Celanese Plan had terminated prior to the transfer of assets, we must consider Section 204(g) of ERISA, 29 U.S.C. Sec. 1054(g), and its counterpart, Section 411(d)(6) of the Internal Revenue Code, 26 U.S.C. Sec. 411(d)(6). Section 204(g) of ERISA prohibits any plan amendment that reduces the early retirement benefits of a participant who "satisfies (either before or after the amendment) the preamendment conditions for the subsidy." 29 U.S.C. Sec. 1054(g)(2). Likewise, Section 411(d)(6) of the Internal Revenue Code states that a "qualified" plan must treat a participant's early retirement benefits in the same manner. As previously noted, Section 208 of ERISA and Section 414(l ) of the Internal Revenue Code require us to hypothesize that the Hoechst Celanese Plan terminated just prior to the transfer of assets to the American Mirrex Plan. Consequently, if this hypothetical termination of the Hoechst Celanese Plan would have constituted an "amendment," Section 204(g) of ERISA and Section 411(d)(6) of the Internal Revenue Code would have required that the plaintiffs be given the opportunity to "satisf[y] (either before or after the [termination] the pre[termination] conditions for the subsidy."
 
 
 87
 While neither Section 204(g) of ERISA nor Section 414(l ) of the Internal Revenue Code expressly states that a termination must be regarded as an amendment for these purposes, Revenue Ruling 85-6 has drawn this conclusion. This ruling concerned the proposed termination of an overfunded defined benefit plan that provided for excess assets (i.e., the value of the plan's assets less the present value of the participants' benefits on a termination basis) to revert to the employer as permitted by Section 4044(b) of ERISA, 29 U.S.C. Sec. 1344(b). The ruling concluded that, upon termination of the plan, those employees who had not yet satisfied the age and years-of-service requirements for early retirement benefits could not be deprived of the right to satisfy those conditions after the date of termination. The ruling further reasoned that those prospective benefits had to be funded by some means before any residual assets could revert to the employer.
 
 
 88
 For the reasons stated in the opinion of the court, I believe that Rev.Rul. 85-6 should be heeded. It follows that, if the Hoechst Celanese Plan had terminated just before the transfer, the plaintiffs would have retained the right to qualify for early retirement benefits after the termination and that assets would have had to have been allocated to these prospective benefits. Consequently, in order to comply with Section 208 of ERISA and Section 414(l ) of the Internal Revenue Code, Hoechst Celanese was required to transfer sufficient assets to the American Mirrex Plan to ensure that at least an equal allocation would occur if the latter plan terminated just after the transfer. Since there is a factual dispute as to whether the defendants in this case transferred sufficient assets to meet this requirement, summary judgment for the defendants was inappropriate.
 
 
 89
 STAPLETON, Circuit Judge, concurring and dissenting:
 
 
 90
 As the court's opinion recognizes, under Sec. 1058 of ERISA, defendants can transfer their liability for early retirement benefits to the American Mirrex Retirement Plan and they have purported to do so. The only issue separating the parties is whether defendants have transferred sufficient assets to that plan to satisfy Sec. 1058. Unlike my colleagues, I conclude that they have.
 
 
 91
 Section 1058 provides that a plan "may not ... transfer its assets or liabilities to any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the ... transfer which is equal to or greater than the benefit he would be entitled to receive immediately before the ... transfer (if the plan had then terminated)." Thus the key to understanding the requirements of Sec. 1058 is to focus first on what benefit the participants would receive if the plan were terminated immediately prior to the transfer. That benefit, and the funding required to pay the present value of the total of all such benefits, establishes the floor of permissibility for the transfer. If each participant would receive no lesser benefit on a termination immediately after the transfer, and the funding is available immediately after to pay an amount equal to the present value of the total of all such benefits, Sec. 1058 is satisfied and the transfer is permissible. See 26 C.F.R. Sec. 1.414(1)-1(e)(i).
 
 
 92
 In order to determine whether a plan participant who had not yet qualified for an early retirement benefit through giving the stipulated years of service to the employer would be entitled to receive something attributable to that benefit upon a termination immediately prior to the transfer, we must look to Sec. 1344, the section that specifies the benefits which must be provided for on a termination. The cases decided prior to the Retirement Equity Act clearly hold that an early retirement benefit is not an accrued benefit and that nothing need be provided on a termination with respect to someone who has not served the employer long enough to earn the early retirement benefit. E.g., Ashenbaugh v. Crucible, Inc., 854 F.2d 1516, 1526 (3d Cir.1988) (defining "accrued benefit" to exclude an early retirement benefit). The issue remains, however, whether the REA reversed this holding. I conclude that it did not.
 
 Section 1054(g) provides in relevant part:
 
 93
 (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, ...
 
 
 94
 (2) For purposes of paragraph (1), a plan amendment which has the effect of--
 
 
 95
 (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
 
 
 96
 (B) eliminating an optional form of benefit,
 
 
 97
 with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.
 
 
 98
 It is my understanding that the early retirement benefit here at issue is retirement type subsidy and, accordingly, that it is an accrued benefit that cannot be reduced if the relevant participant can meet the conditions for the subsidy before or after an amendment. When Sec. 1054(g) and Sec. 1344 are read together, one finds that where a participant has qualified for an early retirement benefit prior to a termination or may thereafter qualify for that benefit by aging and giving additional service to the plan sponsor, the present value of the benefit has to be paid or set aside on termination. On the other hand, where, at the time of termination, a participant has not qualified for such a benefit and will not be able to do so in the future because the opportunity to give service to the plan sponsor will not exist, nothing need be paid or set aside on termination with respect to the early retirement benefit. Thus, if a plan sponsor terminates a plan in the course of a liquidation of its business in bankruptcy, for example, it need pay nothing to a participant who has not given the sponsor sufficient service to qualify for an early retirement benefit. As I understand the plaintiffs to concede, this is the effect of our decision in Berger v. Edgewater Steel Corp., 911 F.2d 911 (3d Cir.1990).
 
 
 99
 The case before us is not materially different from the above liquidation hypothetical. Instead of liquidating and terminating its plan in connection with selling all of its assets to a third party or parties, Hoechst, in the hypothetical posed by Sec. 1058, is terminating a portion of its plan in connection with selling the assets of one of its businesses to a third party. The employees with respect to whom the plan is being terminated are going to work for the third party and will never render the service to Hoechst that it bargained for when it created the early retirement benefit. As a result, no early retirement benefit would be payable to the plaintiffs upon a termination immediately prior to the transfer, and it is immaterial if the funds available after the transfer are insufficient to fund early retirement benefits for plaintiffs under the Hoechst plan.
 
 
 100
 As the court's opinion acknowledges, the Royal Electric and Lear Siegler cases concur in my analysis. I acknowledge that the Hollingshead case does not. In the final analysis, I differ from my colleagues and the Hollingshead court because I find no help in Rev.Rul. 79-336 and Rev.Rul. 80-129 when it comes to determining whether, for purposes of Sec. 1054(g)(2), a participant who has not, and will not in the future, give sufficient years of service to the plan sponsor to qualify for an early retirement benefit is a "participant who satisfies the conditions" of that benefit. Section 1054(g)(2) does not use the phrase "at the time of separation from service" and the referenced Revenue Rulings have nothing to do with the subject matter of Sec. 1054(g)(2) or its companion section of the IRC, Sec. 411.[1] Sections 1054, 1058 and 1344 do, for me, clearly dictate that, in the context of termination, an early retirement benefit of the kind here involved is not accrued and need not be provided for with respect to any participant who will never be able to satisfy a minimum service to the sponsor requirement.
 
 
 101
 I agree with and join the opinion of the court in all other respects.
 
 SUR PETITION FOR REHEARING
 
 102
 Oct. 6, 1993.
 
 
 103
 Before SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and SEITZ, Circuit Judges.
 
 
 104
 The petition for rehearing filed by appellants and the petition for rehearing filed by appellees in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petitions for rehearing are denied. Judge Becker and Judge Stapleton would have granted appellees' petition for rehearing.
 
 
 
 [1]
 We directed the parties to file briefs on the issue of whether we had jurisdiction over this appeal in light of the fact that the district court amended the order appealed from after plaintiffs filed their notice of appeal
 We conclude that the September 28, 1992, order appealed from was a final judgment which disposed of all claims between the parties. Thus, plaintiffs were not required to file a second notice of appeal after the district court later amended the September 28, 1992, order to make certain corrections of a clerical nature. See Fed.R.Civ.P. 60(a); Barris v. Bob's Drag Chutes & Safety Equip., Inc., 717 F.2d 52, 55 (3d Cir.1983) ("[A] motion to correct a clerical mistake does not affect the finality of the original judgment nor does it toll the time limits within which an appeal must be taken." (citations omitted)); Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 113 (3d Cir.) (same), cert. denied, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).
 
 
 [2]
 The district court subsequently denied plaintiffs' motion for reconsideration of its order denying class certification on these two claims
 
 
 [3]
 Plaintiffs do not contend that these brochures contain any statements expressly referring to severance pay. Plaintiffs rely, instead, on a "promise of 'fair treatment' in managing business change." (Pls.' Br. at 36)
 
 
 [4]
 The "ordinary elements" of equitable estoppel include: "(1) a material representation, (2) reasonable reliance upon that representation, and (3) damage resulting from that representation." Gridley, 924 F.2d at 1319
 
 
 [5]
 Our conclusion that Section 204(g) is somewhat ambiguous is consistent with an earlier case where we sought guidance from external sources when interpreting this same statutory section. See Berger v. Edgewater Steel Co., 911 F.2d 911, 918 (3d Cir.1990) (quoting statute's legislative history), cert. denied, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). Indeed, in their briefs, plaintiffs and defendants rely on external sources to support their respective constructions of Section 204(g)
 
 
 [6]
 The reason that many ERISA sections have such counterparts in the IRC is that, to encourage employers to establish pension plans, Congress provides favorable tax treatment for plans which comply with ERISA's requirements. See Plucinski v. I.A.M. Nat'l Pension Fund, 875 F.2d 1052, 1058 (3d Cir.1989) ("The ERISA statute provides tax benefits to employers who [establish an ERISA qualifying pension plan], in order to encourage broad participation."). Compare 26 U.S.C. Sec. 414(l ) (IRC), with 29 U.S.C. Sec. 1058 (ERISA)
 
 
 [7]
 Prior to the favorable vote on the REA, one of the bill's sponsors explained the legislative intent behind the section of the REA which amended Section 204(g) of ERISA as follows:
 [This section] contains an important change in current law having a far-reaching effect in eliminating currently perceived abuses occurring when overfunded pension plans are terminated and the excess assets revert to the employer.... [A] plan is not to be considered ... to have satisfied all of its liabilities to participants and beneficiaries until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit. This change from present law means that for sufficient plans, depending on the circumstances, some or all of the plan assets that would otherwise revert to the employer will now have to be allocated to participant benefits. By sharing in additional plan assets which otherwise would revert to the employer, employees nearing early retirement at plan termination who later meet the plan's early retirement conditions receive an immediate benefit ... [of] increased retirement equity.
 
 
 [130]
 Cong.Rec. H 8763 (daily ed. Aug. 9, 1984) (remarks of Representative Roukema, ranking minority member of House Subcommittee on Labor Management Relations) (emphasis added). This is some evidence that Congress intended for employees to be able to qualify for early retirement even after their employer had terminated their early retirement plan
 
 
 [8]
 Although two courts of appeals have also considered this issue after the enactment of Section 204(g), their opinions do not address the application of that section. See Fuller v. FMC Corp., 4 F.3d 255, 260-61 (4th Cir.1993); Awbrey v. Pennzoil Co., 961 F.2d 928, 932 (10th Cir.1992)
 
 
 [9]
 In its order entered on September 28, 1992, the district court stated: "The motion for summary judgment of defendants ... is granted." We conclude that this grant of summary judgment included the denial of this claim. See supra note 1
 
 
 [1]
 My understanding of the application of Secs. 1054, 1058 and 1344 in circumstances of this kind is, of course, consistent with Rev.Rul. 85-6 which does construe Sec. 411