**Ralph J. ARGEN, III, Plaintiff,**

v.

**NEW YORK STATE BOARD OF LAW EXAMINERS, Defendant.**

No. 93–CV–586H.

United States District Court,
W.D. New York.

Aug. 11, 1994.

Fred G. Aten, Jr., Michelle R. Dennison, Rochester, NY, for plaintiff.

Andrew Lipkind, Albany, NY, for defendant.

### DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to try the case before the undersigned pursuant to 28 U.S.C. § 636(c). A non-jury trial was held on July 6 through 8 and August 8, 1994. The following constitutes the court's findings of fact and conclusions of law.

### FINDINGS OF FACT

The plaintiff, Ralph J. Argen, III, resides in Amherst, New York. The defendant, the New York State Board of Law Examiners (the "Board"), is an instrumentality of the State of New York. It prepares and administers the New York State Bar Examination,

the professional licensing examination required for admission to practice law in the State of New York.

Plaintiff is a 1993 graduate of the State University of New York at Buffalo Law School. He received a Bachelor of Science degree from Syracuse University in 1981 (in geology and numerical geology), a Master of Science degree from the State University of New York at Buffalo in 1988 (in logic), and a Master of Arts degree from the State University of New York at Buffalo in 1989 (in ethics and environmental ethics). Plaintiff has completed his coursework at the State University of New York at Buffalo for a Ph.D. degree in Philosophy, and expects to receive this degree in September of 1994 after defense of his dissertation.

Plaintiff took the Law School Admissions test (LSAT), without special accommodations, on three separate occasions. His scores were as follows:

| Date | Score | Percentile |
|------|-------|------------|
| February 1986 | 16 | 6% |
| October 1987 | 21 | 15% |
| October 1988 | 22 | 18% |

In July of 1989, plaintiff was evaluated by Ronald W. Schworm, who holds a Ph.D. in Special Education and who has evaluated many children and adults for learning disabilities. Dr. Schworm is not a licensed psychologist and is not authorized to conduct psychological testing. Dr. Schworm concluded that plaintiff's performance was indicative of the profile displayed by individuals with language processing problems. Based on Dr. Schworm's recommendation, plaintiff received double time in a separate room for the February 1990 administration of the LSAT. Plaintiff received a 35 on the test, placing him in the 71st percentile. He then applied to and was accepted at the SUNY Buffalo Law School, where he enrolled in the fall semester of 1990.

Upon his arrival at the law school, plaintiff presented Dr. Schworm's report to the Committee on Law Students with Special Needs and requested special testing arrangements for his examinations, including double time and the ability to use a computer to write out essay questions. Based on Dr. Schworm's evaluation, plaintiff's request was granted.

In August of 1992, plaintiff received double time for the administration of the multi-state professional responsibility examination. He successfully passed this exam. This exam was not administered by the Board.

In September of 1992, plaintiff applied to the Board for double time on the July 1993 bar exam. Plaintiff was advised to re-apply in May of 1993, which he did. Plaintiff requested double time and a separate room for completion of the examination.

The Board referred the plaintiff's request to Frank R. Vellutino, Ph.D., for evaluation. Dr. Vellutino reviewed plaintiff's request and supporting materials and recommended that the Board deny plaintiff's request for accommodations. By letter of June 29, 1993, plaintiff was notified that his request for accommodations was denied.

Plaintiff then commenced this action under Title II of the Americans With Disabilities Act (42 U.S.C. § 12101 *et seq.*), challenging the denial of his request for special accommodations on the July 1993 New York State Bar Examination.

By stipulation of the parties, plaintiff was allowed to take the July 1993 bar examination with special accommodations with the understanding that, if he passed, his test results would be certified to the Appellate Division only if he also succeeded in this suit. With the special accommodations, plaintiff passed the bar exam. He now seeks an order compelling the defendant to certify his passing score to the Appellate Division, Fourth Department. He also seeks attorneys fees. Plaintiff has withdrawn his request for compensatory damages.

Plaintiff called three witnesses to testify at trial. The first witness was the plaintiff, Ralph Argen. His testimony is in large part uncontested by defendant.

Plaintiff testified that throughout his high school and college years he had learning problems. He had a disparity between his grades and his own perception and his teachers' perceptions of his abilities. He was on academic probation during college and he observed that he did poorly on timed examinations. While in graduate school, he took a course entitled "Methods of Inquiry," which

assisted him in learning techniques to compensate for his learning problems. He learned how to use flow charts and diagrams to assist him in answering questions on written examinations. He also avoided timed examinations.

Plaintiff initially contacted Dr. Schworm because of his low scores on the LSAT exams. He cites the vast improvement on his LSAT scores after he received special accommodations as further proof of his disability. He received special accommodations throughout law school. Because the bar exam is a difficult timed examination, he feels that it is especially important to receive special accommodations on this examination.

The second witness to testify on behalf of plaintiff was Dr. Schworm. Dr. Schworm administered a series of tests to plaintiff in July of 1989. Dr. Schworm's conclusions are summarized in his report of July 31, 1989, entered into evidence as Ex. 11. Dr. Schworm concluded that Mr. Argen's test scores were "indicative of the pattern or profile of adults with language processing problems."

The third witness called by the plaintiff was Joseph Langen, Ph.D. Dr. Langen is a licensed psychologist with a largely clinical background. Dr. Langen evaluated the plaintiff in January of 1994. He administered the Wechsler Adult Intelligence Scale–Revised, the Wechsler Individual Achievement test and the Rey–Osterreith Complex Figure test. According to Dr. Langen, plaintiff has difficulty with spatial relationships, which interferes with his ability to perform reading comprehension tasks at a rate competitive with non-disabled persons. In his opinion, plaintiff has a right hemispheric learning disability and should be given double time for the bar examination in order to place him on a level playing field with non-disabled individuals.

The defendant called Dr. Vellutino as its only witness. Dr. Vellutino is a psychologist and a professor at the State University of New York at Albany. He holds positions in the Departments of Linguistics, Psychology and Educational Psychology and Statistics and is Director of the Child Research Study Center.

Dr. Vellutino testified that since 1987 he has acted as a consultant to the Board when individuals request special accommodations due to reading disabilities. He grants the requests in approximately 25% of the cases. He reviewed the plaintiff's materials submitted to the Board and concluded that the material did not support a finding of developmental language learning disability. In Dr. Vellutino's view, the diagnosis of a learning disability was not supported by the test scores which Dr. Schworm chose to report, which were largely in the average and above-average range.

Dr. Vellutino also reviewed the results of the tests administered by LeAdelle Phelps, a licensed psychologist. At Dr. Vellutino's request, Dr. Phelps administered the Woodcock Reading Mastery Tests–Revised, Forms G & H (word identification and word attack subtests) and the Woodcock–Johnson Tests of Achievement–Revised, Form A (word identification and word attack subtests). According to Dr. Vellutino, the results of these tests confirmed that plaintiff did not have a language-based learning disability. He also reviewed the scores reported by Dr. Langen and concluded that these test scores were not consistent with a learning disability related to reading.

### CONCLUSIONS OF LAW

#### Coverage Under the ADA.

■ The threshold question is whether plaintiff has presented sufficient evidence to support the conclusion that he is a "qualified individual with a disability" within the meaning of the ADA. Title II of the ADA provides in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The statute defines the terms "public entity" and "qualified individual with a disability" as follows:

**(1) Public entity**

The term "public entity" means—

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. . . .

**(2) Qualified individual with a disability**

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(1), (2). "Disability" is defined as follows:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Department of Justice regulations further describe disability with respect to an individual as encompassing "[a]ny mental or psychological disorder such as . . . specific learning disabilities." 28 C.F.R. § 35.104(1)(i)(B). The phrase "major life activities" means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 35.104(2).

As to providing accommodations on the state bar exam, the statute provides:

Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer accessible arrangements for such individuals.

42 U.S.C. § 12189. The regulations provide: Any private entity offering an examination covered by this section must assure that . . . [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure). . . .

28 C.F.R. § 36.309(b)(1)(i). Even though it purports to regulate only "private" entities, this regulation has been interpreted to apply to the State Board of Bar Examiners. *Pazer v. New York State Board of Law Examiners,* 849 F.Supp. 284, 286–87 (S.D.N.Y.1994).

Thus, once an applicant for the state bar exam has established that he or she has a specific impairment that substantially limits his or her learning ability, the Board is required to make "reasonable accommodations" to ensure that the applicant is not disadvantaged in taking the exam. 42 U.S.C. § 12112(b)(5)(A); *D'Amico v. New York State Board of Law Examiners,* 813 F.Supp. 217, 221 (W.D.N.Y.1993).

Here, plaintiff has the burden of proving by the preponderance of the evidence that he suffers from a "specific learning disability." The parties agree that if plaintiff meets this burden, he is entitled to the special accommodations requested—*i.e.,* double time on the examination in a quiet room.

The regulations for the ADA refer to, but do not define, specific learning disabilities. However, the Individuals with Disabilities Education Act (IDEA) contains a definition of "children with specific learning disabilities". It provides as follows:

The term "children with specific learning disabilities" means those children who have a disorder in one or more of the basic

psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

20 U.S.C. § 1401(a)(15). The IDEA was passed before the ADA. Since there is no definition of "specific learning disability" in the ADA, the term should be construed consistently with the definition Congress provided in the IDEA.

Plaintiff's theory at trial is that he has a non-verbal, right hemisphere disorder which severely impairs his ability to learn and read at the same pace as non-disabled individuals. In support of his theory, plaintiff called as experts both Dr. Schworm and Dr. Langen. Defendant called Dr. Vellutino, who provided testimony in sharp conflict with Drs. Schworm and Langen.

The issue before the court is to resolve the conflict between the expert witnesses. For the reasons set forth below, I find the plaintiff has failed to demonstrate that he suffers from a "specific learning disability." This finding necessarily entails rejecting the testimony of plaintiff's experts and accepting the testimony of defendant's expert. Dr. Vellutino is an acknowledged expert on whose opinion the Board and the Court are clearly entitled to rely. *See, e.g., Pazer v. New York State Board of Examiners, supra,* 849 F.Supp. at 287; *Hiller v. Board of Education,* 743 F.Supp. 958, 971 (N.D.N.Y.1990). Dr. Vellutino's testimony is credible, persuasive and within the mainstream of scientific analysis in his field. He demonstrated through his testimony far superior academic credentials, accomplishments and familiarity with the field than plaintiff's experts. Moreover, as explained below, Dr. Schworm's and

Dr. Langen's testimony conflicted in some important respects.

Accordingly, I find that Dr. Vellutino's testimony is entitled to greater weight and that Dr. Schworm's and Dr. Langen's testimony must be rejected.

### 1. *Dr. Schworm's Testimony.*

As previously indicated, plaintiff was tested by Dr. Schworm in July of 1989. The test results are reported in Ex. 13 and are analyzed in Dr. Schworm's report in Ex. 11. The testimony at trial established that with the exception of three of the tests given by Dr. Schworm, all of the plaintiff's test results were within the normal range.

Dr. Schworm testified that he conducted a "qualitative" analysis of plaintiff's performance on the tests and that this qualitative analysis supports a finding of learning disability, even though the test results were largely normal. I refuse to find a disability based on Dr. Schworm's qualitative analysis of normal test results. This testimony was too vague to distinguish on any reliable basis between learning disabled readers and readers whose poor performance is caused by other factors, such as poor education, anxiety, lack of motivation or low intelligence.

The tests on which plaintiff's scores were below normal were the Spelling Pattern Test, the Associate Memory Test and the Sentence Repetition Test (Detroit Test of Learning Ability). These three tests in isolation do not provide sufficient verification of a reading-based learning disability.

The Spelling Pattern Test is a test devised by Dr. Schworm and is not normed for adults. No score or qualitative information was provided which would enable this test to be validated. Furthermore, as discussed below, plaintiff's performance on the spelling test administered by Dr. Langen as well as his performance on the tests administered by Dr. Phelps were inconsistent with Dr. Schworm's conclusion that the plaintiff was weak in phonetics and word analysis.

As to the Sentence Repetition Test, Dr. Vellutino testified that insufficient information was given in order to enable him to validate or double check the test results.

The same is true for the Associate Memory Test. Accordingly, Dr. Schworm's testing is inconclusive.

Dr. Schworm was not able to define with any reasonable precision how he defines or diagnoses this type of learning disability, or how he distinguishes between low intelligence or low reading achievement and a specific learning disability. He testified that plaintiff's performance on the tests was "indicative of the pattern or profile displayed by adults with language processing problems" or a "specific developmental language disability" with specific weaknesses in phonetics, word pronunciation and the syntax of language. Yet he could not identify any criteria for categorizing learning problems in this fashion or show that the testing he used and the results he obtained are generally accepted in the scientific community as a reliable basis for establishing this type of learning disability. Dr. Schworm also relied heavily on plaintiff's spelling errors to support his conclusion. However, he never correlated spelling errors to poor reading.

Finally, Dr. Schworm's opinion appeared to be discredited by plaintiff's second expert, Dr. Langen. Dr. Langen testified that the plaintiff had particular limitations in mathematics and spatial relationships, and that this pattern was consistent with a right hemisphere learning disability. In contrast to Dr. Schworm, Dr. Langen found plaintiff to be good in the verbal areas but weak in the non-verbal, areas, such as visualization and spatial relationships. Upon being confronted with Dr. Langen's opinion, Dr. Schworm altered his assessment to find that the plaintiff's problems were not so much with phonetics or the language aspects of reading but with visualization. This appears to be a direct about-face and is contradicted by Dr. Schworm's own test results, which show that plaintiff scored in the average range on the Raven Progressive Matrices test, a test of visual and spatial relationships.

For all of these reasons, I find that Dr. Schworm's testimony is not credible.

## 2. *Dr. Langen's Testimony.*

I then turn to the testimony of Dr. Langen, plaintiff's second expert. Dr. Langen conceded that plaintiff does not suffer from a verbal language-related learning disability, which is based in the left side of the brain. Instead, he concluded that plaintiff has problems with visualization and spatial relationships, which are based in the right side of the brain. Dr. Langen therefore concluded that plaintiff suffered from a right hemispheric non-verbal learning disability.

The primary test relied on by Dr. Langen for this conclusion is the Rey–Osterreith test. This is a test in which the subject is shown a complex geometric figure and asked to copy the figure onto a separate sheet of paper. Immediately thereafter, the subject is asked to recall the figure without being shown it again. Approximately 20 minutes later, the subject is again asked to draw the figure from memory. Dr. Langen testified that on immediate recall, plaintiff lost many of the details and could not recall the parts of the figure that were missing. On delayed recall, his recall of the parts was very fragmented and he drew six separate parts. Based on this, Dr. Langen concluded that plaintiff has extreme difficulty in the area of spatial relationships and particularly in his memory of these relationships when they are not visually present. (Ex. 26).

Plaintiff did not present any proof that this test was used to discriminate between good and poor readers, nor did plaintiff show a correlation between decreased spatial ability and poor performance on the bar exam or on reading tests. This is a critical omission in plaintiff's proof. If poor spatial ability does not predict poor reading, then plaintiff's performance on this test is irrelevant to the diagnosis.

Furthermore, the interpretation of the test results on the Rey–Osterreith is highly subjective. Very few persons can actually complete the test without error because the figure is extremely complex.

I find insufficient proof of a visual or spatial deficit to justify a conclusion of right hemisphere learning disability. Dr. Langen's conclusion based on this one exam is in direct conflict to plaintiff's performance on the Raven Progressive Matrices, mentioned

above. This calls into question the credibility of Dr. Langen's conclusion.

In addition to the Rey–Osterreith test, Dr. Langen relied on plaintiff's subtest scores in certain of the performance areas on the Wechsler Adult Intelligence Scale–Revised. However, these subtest scores were not entirely consistent. Plaintiff's performance on the picture completion and picture arrangement subtests were average and above average. His performance on the block design, object assembly and digit symbol subtests were below average, but the block design score was still within the standard deviation of the mean. Dr. Langen did not show with any reasonable degree of certainty that these lower subtest scores were indeed indicative of a learning disability. Furthermore, plaintiff's performance on the achievement test showed a reading comprehension level at the 95th percentile as well as a mathematical reasoning performance at the 82nd percentile.

Finally, I find that Dr. Langen did not sufficiently define the term "right hemisphere learning disability." Plaintiff did not prove that this was an accepted category of learning disability in the scientific community. Plaintiff did not show how one tests for such learning disability or indeed that it is generally accepted in the scientific community as a whole.

It is true that there was a large disparity between plaintiff's performance on the LSAT without special accommodations and his performance with special accommodations. From that, plaintiff argues that the court should infer the existence of a learning disability.

I am not persuaded that such a disparity compels that conclusion, especially since that disparity could be the result of many other factors, such as stress, nervousness, cautiousness or lack of motivation. As noted by the court in *Pazer v. New York State Board of Law Examiners, supra,* to hold otherwise would compel the conclusion that any underachiever would by definition be learning disabled as a matter of law. 849 F.Supp. at 284 (S.D.N.Y.1994).

### 3. *Dr. Vellutino's Testimony.*

Dr. Vellutino testified that he denied accommodations to plaintiff because the test scores submitted by Dr. Schworm were inconclusive and he felt plaintiff's writing skills were very strong as reflected in the letter submitted by plaintiff in support of his request for accommodations. In addition to the weaknesses in Dr. Schworm's analysis outlined above, Dr. Vellutino pointed out that plaintiff's performance on the Auditory Syntax Comprehension test was inconsistent with Dr. Schworm's diagnosis of a language disability. He also testified that it was very common to have problems recalling pairs that were unrelated which would explain plaintiff's poor performance on the Associate Memory test. According to Dr. Vellutino, it also is unusual to find someone scoring lower in the Sentence Repetition test than in the Digit Span test because the literature supports the view that the Sentence Repetition test is easier than the Digit Span test.

While Dr. Vellutino concedes that the experts disagree on the underlying causes of learning disabilities, he testified that experts did agree that persons with reading disabilities should have below average scores on reading subtests. Below average subtests scores are in the range of 0–20%. To give the applicant the benefit of the doubt, he has adopted the 30th percentile as a benchmark, below which he would consider a person learning disabled and above which he would consider a person not learning disabled. He described his 30% criteria as an arbitrary cut-off line, but one which was based on rational factors.

Based on the inconclusive and inconsistent test scores submitted with plaintiff's application, Dr. Vellutino requested that Dr. Phelps give additional tests to the plaintiff to evaluate his performance of reading sub-skills. Plaintiff was given the Woodcock Reading Mastery Tests–Revised (Form H), on which he scored in the 40th percentile for word identification and 42nd percentile for word attack. He also took the Woodcock Reading Mastery Tests–Revised (Form G), on which he scored in the 26th percentile for word identification and the 29th percentile for work attack. Finally, plaintiff took the

Woodcock–Johnson Tests of Achievement–Revised (Form A), on which he scored in the 50th percentile for word identification and the 57th percentile for word attack. Dr. Vellutino chose these tests because they are normed across broad age ranges. These are widely used, well established tests and they correlate well with reading ability. He also felt that these tests would clarify the areas in Dr. Schworm's testing which were inconsistent or unclear.

Plaintiff's average score for forms G and H combined was 33% for word identification and 34% for word attack. Dr. Vellutino feels that it is appropriate to average both forms G and H because more data yields more accurate results. When combined with plaintiff's performance on the Woodcock–Johnson tests, Dr. Vellutino concluded that plaintiff is not learning disabled.

Dr. Vellutino did not credit Dr. Langen's report because there is no correlation between visual and spatial weakness and reading ability. Furthermore, he noted conflicting scores on spatial relations between Dr. Langen's test (the Rey–Osterreith) and Dr. Schworm's test (the Raven Progressive Matrices). In addition, if one has a right hemisphere learning disability, Dr. Vellutino would expect to find problems with mathematics and reasoning. In these areas the plaintiff consistently scored above average. Dr. Vellutino would also expect to see a reading comprehension problem, but in this area the plaintiff scored in the 95th percentile.

Considering all the testimony, I find Dr. Vellutino's use of an objective standard to define learning disabilities to be more appropriate in this context than the undefined and unquantified standards proposed by plaintiff's experts. I also find that for the purpose of evaluating requests for accommodations on the bar exam, Dr. Vellutino's use of widely accepted objective methods of testing for a reading-based learning disability are far preferable than the "qualitative" analysis performed by Dr. Schworm or the Rey–Osterreith test results relied upon by Dr. Langen.

On balance, therefore, defendant's expert testimony is entitled to greater weight, tip-ping the scales in defendant's favor. Accordingly, I find that plaintiff has failed to meet his burden of proving that he is a qualified individual with a disability under the ADA, requiring dismissal of the complaint.

## CONCLUSION

For the foregoing reasons, the Clerk of the Court is directed to enter judgment in favor of the defendant dismissing the complaint.

**SO ORDERED.**