Donald D. ILLINGWORTH, Plaintiff,

v.

NESTLE U.S.A., INC., t/a Nestle
Food Company, Defendant.

Civil Action No. 95–2409(JCL).

United States District Court,
D. New Jersey.

May 21, 1996.

David Schechner, Schechner & Targan, West Orange, NJ, for Plaintiff.

Vincent E. Reilly, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Defendant.

## OPINION

LIFLAND, District Judge.

■ This case presents the question of whether an employer can violate the handicap provision of the New Jersey Law Against Discrimination ("LAD") when, at the time it decided to fire the employee, it indisputably lacked knowledge of the employee's handicap. After canvassing New Jersey law and cases interpreting federal antidiscrimination statutes, the Court holds that the employer's knowledge of the employee's handicap is an element of the plaintiff's prima facie case. Absent such knowledge, the prima facie case fails and the employer cannot, as a matter of law, be liable for handicap discrimination.

### Overview

Nestle U.S.A., Inc., t/a Nestle Food Company ("Nestle") moves for summary judgment dismissing Donald Illingworth's handicap discrimination and breach of contract suit. Nestle disputes whether Illingworth, who is dyslexic, is handicapped within the definition of the Americans With Disabilities Act ("ADA") and the LAD, and contends that neither it nor even Illingworth knew of his dyslexia until months after he was terminated. Thus, he can establish no causal connection between his dyslexia and the decision to terminate him. Illingworth responds that Nestle knew or should have known about his dyslexia given the severe difficulty he encountered trying to master the computer skills that had become part of his job. As for the breach of contract claim, which pertains to Illingworth's alleged entitlement to severance benefits, Nestle argues that there is no genuine dispute that Illingworth is not entitled to additional severance benefits, a claim governed by ERISA rather than the New Jersey common law asserted by Illingworth.

For reasons articulated below, the Court will grant summary judgment and dismiss this lawsuit.

### Factual Background

Illingworth's parents recognized when he was quite young that he had some form of learning disability. To remedy this, they sent him to special schools until he was able to return to the public school system. *See* Illingworth Cert. at ¶ 3. Attached as Exhibit A to his Certification is a letter, written in 1955, from the Director of the Reading and Study Skills Center, Inc., discussing his reading problem and the progress achieved to date.

Despite his learning disability, Illingworth completed high school, college and a tour in the U.S. Navy, where he performed clerical

and administrative duties. *See* Illingworth Dep. (Ex. 2 to Def's Brief) at 22. After college, in 1970, he joined Nestle's predecessor as a Sales Representative. *See id.* at ¶ 4. In 1976, he was promoted to District Trainer and then Senior Territory Manager. Subsequent promotions raised him, by 1986, to the position of Account Executive, where his responsibilities included managing various regional accounts and developing marketing strategies and inventory control ideas. *See id.* at ¶¶ 5–7. In 1992, Nestle promoted him to Business (or Merchandiser) Analyst.

As a Business Analyst, he was to research and report to the customers [he] was working with the industry trends and information relative to the areas of [his] expertise. Essentially [he] was to transmit the trends and information learned to the specific purchasing persons of [Nestle's] customers so that they, being informed of [its] growth in market share, would buy more of [Nestle's] product. In addition, [he] would conduct certain kinds of analytical studies and the like in order to provide background for the introduction by the defendant of new items in the market. [He] would also, to the extent allowed, conduct space management analysis functions for [his] customers. [He] would report the results to the customers so as to be able to request from them an assignment to [Nestle's] products of the 'best' shelf space that could be obtained. Placement of one's product in a supermarket department is regarded as being of great importance. One wishes to be placed where one is not only easily seen by the passing consumer, but it is also a location where a consumer wishing to take [Nestle's] product can easily do so. In order to do this as an advisor to the supermarkets and to the persons within the supermarket organization who would be responsible for the set up of the department in question, a person in [his] job would perform research by first collecting and then analyzing the data needed to make a recommendation of shelf placement. Items such as percentage of market, how this impacted on shelf placement, etc. became paramount.... It was the idea that the Business or Merchandising Analyst would convince the Corporate Manager who had the ultimate decision on placement to place [Nestle's] product in a more advantageous position than that of [the] competition.... [I]t is the Supermarket and its personnel that has the ultimate decision making power as to shelf location....

*Id.* at ¶ 9. To perform these duties, Illingworth needed to use a computerized Plan–O–Gram program which, *inter alia,* gave the user the ability to graphically show store representatives what a particular shelf set-up would look like. *See* Cannon Decl. at ¶ 3; Illingworth Cert. at ¶ 10. Being given Plan–O–Gram responsibilities by a grocery chain, i.e. being named Captain for a particular department, gives the responsible sales representative a competitive advantage in that particular chain's stores and is considered an important element of successful sales. *See* Cannon Decl. at ¶ 3. Illingworth states, however, that in his experience being named Captain does not result in automatic placement and increased sales. *See* Illingworth Cert. at ¶ 11. He also asserts that he would give constructive comments about the Plan–O–Grams submitted by competitors to try to demonstrate why better placement for Nestle products was in the retailer's interest. *See id.* at ¶ 12. Nestle does not dispute or even address this point.[1]

In March 1994, one of Illingworth's primary customers, Pathmark, took its store's Plan–O–Gram duties away from Illingworth. *See* Illingworth Dep. at 88. Prior to this, he had sole Plan–O–Gram responsibilities for several sections of the store. According to John Cannon, Illingworth's regional manag-

---

1. Illingworth disagrees with his superiors that obtaining Plan–O–Gram responsibilities is a distinct advantage. He states, without support, that it is a "fact" that product sales are directly affected more by marketing and advertising than by shelf placement. Illingworth Cert. at ¶ 15. This dispute is not material since the employer is entitled to set performance criteria that are ra-

tionally related to the job. Even if it is wrong about the importance of the Plan–O–Gram, Nestle has the prerogative to exercise its business judgment and reach an erroneous conclusion, as long as the evaluative criterion is not a pretext for unlawful discrimination. Illingworth does not allege that emphasis on obtaining Plan–O–Gram responsibilities discriminates in general.

er, on March 16, the Pathmark Space Manager told Cannon that he was dissatisfied with Illingworth's space management performance, expressing concerns with his Plan-O-Gram timeliness and thoroughness, cooperativeness in scheduling resets, and flexibility in meeting Pathmark's needs.[2] Cannon was concerned because Pathmark was an important customer and Illingworth had notified neither him nor Rick Rising, Illingworth's immediate supervisor.[3] Absent such notice, Nestle could not formulate a plan to try to prevent loss of Plan-O-Gram responsibilities. Illingworth also lost the A & P captaincy. *See* Cannon Decl. at ¶ 7. Cannon reported his concerns regarding Illingworth's performance to his superiors at Nestle, and his decision to terminate plaintiff for performance reasons was approved. On March 21, 1994, Illingworth was notified of his termination. His position was filled in late November 1994.[4]

At no time prior to his termination did Illingworth tell his Nestle supervisors that he suffered from a medical condition that

adversely affected his ability to perform his duties as a Business Analyst. *See* Illingworth Dep. at 103–104;[5] Illingworth Cert. at ¶ 26; Cannon Decl. at ¶ 6. He told them a number of times that he was having great difficulty mastering the computer skills necessary to timely generate Plan-O-Grams. In January 1994, after Illingworth performed unsatisfactorily on an analytical test, he was warned that his performance needed to improve. He asked to be placed in a different job, perhaps his old sales job, a request Cannon denied as not in Nestle's best interests and, in any event, impossible due to the unavailability of sales positions in the New York area in early 1994. *See* Illingworth Cert. at ¶ 21; Cannon Decl. at ¶ 8. According to Cannon, he "had the impression that Mr. Illingworth was not picking up computer skills as quickly as some others, [but] he did not attribute this to any mental or physical condition and [it] was not so pronounced as to suggest anything other than that he was less computer literate than some other employees." *Id.* at ¶ 9.

---

2. Illingworth states that he is "told by [his] counsel that this, so far as the record is concerned, is a hearsay statement and is not supported by any written document in the file." Illingworth Cert. at ¶ 23. Such legal argument is inappropriate in a certification. In any event, the declarant's statement is non-hearsay because it is not offered for its truth but rather for its effect on the hearer. Illingworth compounds the evidentiary problem when he *states, without any support:* "I cannot believe that [the Pathmark employee] ever expressed a view that he was dissatisfied with my thoroughness, cooperativeness and my scheduling of resets or of my flexibility in meeting the customer's needs. It is my recollection and I am sure that the Managers at Pathmark will bear me out, that I was always most cooperative, glad to meet with them at almost any hour of the day or night in order to accomplish resets or whatever it was that they wished." *Id.* Plaintiff submits no statements from Nestle customers to substantiate his assertions. Such speculation is legally insufficient to create a genuine issue of material fact that would preclude summary judgment.

3. Illingworth responds in his certification: "[v]ery frankly, I did not report the matter to Mr. Cannon because I believed that I could set it right and recover the plan-o-gram function and responsibility. Mr. Cannon discovered that it had happened before all of my efforts to recover the plan-o-gram function had come to naught. I would, within a few days, have told him had all of my plans failed and the Captaincy had gone to

another. I did not think it was important that I tell him as soon as it happened since, as indicated, I believed I could recapture the Captaincy and I knew that 'bottom line', this would not, in any way, adversely affect sales of our products to Pathmark." Illingworth Cert. at ¶ 18. He offers no foundation for his knowledge that sales would not be adversely affected.

4. According to Cannon, "[b]ecause Mr. Illingworth's performance deficiencies had caused the loss of substantial space management functions, [he] did not initially know *whether Business Analysis functions in the New York region would be sufficient to justify filling the vacant position. When it became apparent that business analysis functions*, and the necessity of competing for space management opportunities at our major customers, required that [he] have a Business Analyst, Gordon Day was transferred into the position." Cannon Decl. at ¶ 8.

5. In response to a question about whether he told Cannon about his problems developing computer skills, Illingworth testified as follows: "Openly, well, as far as just broadly saying that it's not easy and there was a, well, let's see, I'm not sure of the word to use, but advances coming on a daily basis as far as updates to whatever software program it was, and it seems that every month there was an additional ScanTrack information update, and I guess in a nutshell it was all moving very fast." Dep. at 104:12–19.

Illingworth remained on Nestle's payroll until June 1, 1994, and was given an additional two months as severance pay when he failed to obtain other employment by June 1, 1994. *See* Cannon Decl. at ¶ 4. In September 1994, some six months after the termination decision, Illingworth was identified by a Suburban Learning Center, Inc. Learning Consultant as having "test results ... consistent with a perceptual impairment/learning disability commonly known as dyslexia." Illingworth Dep. at 120–122 and Dep. Ex. 9.

In late April, 1994, after his termination, Illingworth asked to see the Human Resource Manual. He had never reviewed the provision about termination benefits before April 29, 1994. *See* Dep. at 74:12–18. The termination benefits policy, issued on March 1, 1994 and only circulated to Human Resources staff (not Nestle employees) for guidance purposes, *see* Peebles Decl. at ¶ 4, applies in cases where an employee has been terminated because of a "job elimination, consolidation, or displacement caused by a closure, reduction in workforce, divestiture, or restructuring...." *Id.*, Attachment A. Nestle does not have a policy of providing salary continuation or similar severance benefits to employees terminated because of performance deficiencies. *See id.* at ¶ 2.

## Discussion

■ Summary judgment is not a disfavored procedural shortcut, but rather an essential thread in the fabric of the Federal Rules that eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "This burden ... may be discharged by 'showing' ... that

there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2554. All evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. at 2510–11.

## Americans With Disabilities Act Claim

■ The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions [or] privileges of employment." 42 U.S.C. § 12112(a). It not only outlines an antidiscrimination regime, but also imposes upon employers the duty to reasonably accommodate the known disabilities of employees or applicants unless to do so would present an undue hardship for the employer. *See* 42 U.S.C. § 12112(b)(5)(A).

■ The Court will dismiss this claim without reaching the merits because Illingworth concededly failed to exhaust the available administrative remedies, a statutory prerequisite to a civil action.

## New Jersey Law Against Discrimination Claim

New Jersey enacted its Law Against Discrimination some two decades before Congress passed the Civil Rights Act of 1964, a federal instrument to excise illegitimate discrimination from America's workplaces. Although the first version of the LAD prohibited such scourges as race and ancestry discrimination, in 1972 the legislature

amended the statute to also proscribe discrimination predicated on an applicant or employee's handicap. *See* N.J.S.A. 10:5–4.1; *see generally Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 446 A.2d 486 (1982). Someone is handicapped if he "suffers from physical disability ... or from any mental, psychological or developmental disability resulting from anatomical, psychological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic tests." N.J.S.A. 10:5–5q.

### Is Illingworth Handicapped?

 Nestle first argues that Illingworth is not handicapped within the meaning of the LAD since his dyslexia does not substantially limit a major life activity, i.e. his ability to work. But the LAD, unlike the Americans With Disabilities Act, "has no such 'major life activities handicap' requirement." *Gimello v. Agency Rent–A–Car Systems, Inc.,* 250 N.J.Super. 338, 358, 594 A.2d 264 (App.Div.1991).[6] Moreover, even under the ADA (or Rehabilitation Act), where plaintiffs have established that they suffer from dyslexia,[7] courts generally consider them within the protected class. *See, e.g., Stutts v. Freeman,* 694 F.2d 666 (11th Cir.1983); *Ciampa v. Runyon,* 1996 WL 146283 (D.Mass.); *Argen v. New York Bd. of Law Examiners,* 860 F.Supp. 84 (W.D.N.Y.1994); *DiPompo v. West Point Military Academy,* 708 F.Supp. 540 (S.D.N.Y.1989). *But cf. Sherman v. Optical Imaging Systems, Inc.,*

843 F.Supp. 1168 (E.D.Mich.1994).[8] The Court therefore assumes, without deciding, that Illingworth is handicapped within the meaning of the LAD.

### Nestle's Lack of Knowledge of Illingworth's Dyslexia

Nestle contends that as a matter of law and logic it could not have terminated Illingworth because of a handicap when it did not even know he suffered from that handicap until six months after the termination decision. It argues, essentially, that before an employer incurs a duty to explore possible avenues of reasonable accommodation,[9] and for any decision to be "because of" a handicap, it must know that an employee suffers from a handicap.

Confronted by a nearly identical fact pattern, the court in *Stola v. Joint Industry Board,* 889 F.Supp. 133 (S.D.N.Y.1995), granted summary judgment where the plaintiff sued after he was fired for poor performance and menacing behavior. As here, it was not until sometime after his termination that the plaintiff discovered that he had a mental disorder, which the court assumed directly caused the behavior for which he was fired. Because the behavior could have been caused by poor judgment and mere misbehavior, the court dismissed the suit, holding that it would be "manifestly ... unreasonable in such circumstances to hold [the defendant] responsible for failing to determine ... whether that behavior was the product of a mental disorder." *Id.* at 136.

---

6. The ADA defines disability as follows: "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individuals; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

7. Although Nestle argues that the competent record evidence is insufficient to establish that Illingworth has dyslexia, the Court need not decide this question since, as discussed below, Illingworth fails to satisfy other aspects of his prima facie case.

8. *Sherman v. Optical Imaging Systems, Inc.* is distinguishable because there plaintiff failed to submit evidence that he suffered from dyslexia and testified that he did not believe his dyslexia impaired his ability to work. "Without any evi-

dence that Sherman's alleged dyslexia significantly interfered with his life in any way, the Court ha[d] no choice but to hold that he [was] not 'handicapped' as defined by [the ADA or the Michigan Civil Rights Act]." 843 F.Supp. 1168, 1177 and 1180 (E.D.Mich.1994).

9. Although the LAD's text does not itself require that employers reasonably accommodate handicapped employees and applicants, N.J.A.C. 13:13–2.5(b) mandates that an employer "make a reasonable accommodation to the limitations of a handicapped employee or applicant unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." *See Ensslin v. Township of North Bergen,* 275 N.J.Super. 352, 362–63, 646 A.2d 452 (App.Div.1994).

Similarly, in *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir.1995), an ADA suit where the defendant terminated the plaintiff without any knowledge that he was disabled, the Seventh Circuit carefully set forth the legal and normative infirmities inherent in the plaintiff's position. The defendant maintained that it fired the plaintiff for performance reasons, a contention that was not thrown into genuine dispute by plaintiff's speculation that his employer must have known he suffered from primary amyloidosis, an often-fatal disease that seemed to be causing some of his workplace problems. "We think", the court explained, "that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. This is supported both by simple logic and by the conclusions of other courts that have considered analogous issues." *Id.* at 932. The court explicitly rejected the argument that firing someone because of the symptoms of his disability is the same as firing someone because of the disability itself. *See id.* at 933–934. But the court did recognize that some symptoms are so patently associated with certain disabilities that it would be reasonable to infer the employer's knowledge of the disability. *See id.; Morisky v. Broward County*, 80 F.3d 445 (11th Cir.1996) (granting summary judgment where the employee failed to establish a prima facie case since employer lacked knowledge that cerebral palsy caused plaintiff's illiteracy); *Miller v. National Cas. Co.*, 61 F.3d 627 (8th Cir.1995) (granting summary judgment in an ADA case where the employer was not told and could not infer that the employee suffered from manic depression); *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178 (6th Cir.1993) (granting summary judgment in a Rehabilitation Act case where the employer had no knowledge that its employee suffered from a mental disorder).

Recently, the Third Circuit dealt with a related question and relied on the *Hedberg* analysis. In *Patricia McGuirk Geraci v. Moody–Tottrup, International, Inc.*, 82 F.3d 578 (3d. Cir.1996), the court affirmed a grant of summary judgment in a pregnancy discrimination suit where the employer terminated the plaintiff before becoming aware of her pregnancy (which was in its first few weeks). Citing *Hedberg*, the court explained that "disabilities are often unknown to the employer, and, because of that, the plaintiff must demonstrate that the defendant employer knew of the disability to state a prima facie case of unlawful discharge." *Id.* at 581.

Since New Jersey courts cite ADA, Title VII, and Rehabilitation Act cases as persuasive interpretations of the standards of proof under the LAD, cases such as *Geraci, Hedberg* and *Stola* provide the proper framework for analysis of Illingworth's claim. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1212 (3d Cir.1995); *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 570 A.2d 903 (1990). Because there is no genuine dispute that Illingworth never told Nestle about his dyslexia (*see* Illingworth Cert. at ¶ 26; Illingworth Dep. at 103–104; Cannon Decl. at ¶ 6), he fails to make out a prima facie case of handicap discrimination under the LAD unless a jury could reasonably find that Nestle should have inferred that he was dyslexic from the difficulties he encountered utilizing computers.

Illingworth contends that his repeated requests for computer assistance and the fact that he was clearly struggling more than other Business Analysts in his attempt to master computer skills cried out for recognition by Nestle. He further submits that Cannon and Nestle knew or should have known that some handicap was causing his difficulties and had a duty to inquire as to whether he required some form of accommodation. The Court disagrees.

■ Computer illiteracy or difficulty is not a symptom one inevitably would assume derives from a learning disability generally or dyslexia in particular. Accordingly, it is not a symptom of a disability that is "so obviously [a] manifestation[ ] of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability." *Hedberg*, 47 F.3d at 934. If Illingworth himself never thought to get tested for dyslexia or at least to raise the issue with Nestle, even though he "knew as a child that [he] had a learning disability that affected [his] ability to read and comprehend, as

well as to handle numeric concepts, visual images and problems using such images", Illingworth Cert. at ¶ 3, no court or jury should consider his symptoms so obviously associated with a learning disability as to support the inference of knowledge necessary to satisfy his prima facie case. *See Geraci*, at 581 (prima facie case requires that plaintiff demonstrate that employer knew of the disability). Nor would the fact that he requested a transfer necessarily suggest to a reasonable factfinder that Illingworth was unable to perform his job duties because of a mental disability. It would more likely indicate that he, perhaps like many people of his generation who did not grow up with computers, lacked facility and comfort with this new and rapidly-changing technology. If summary judgment was appropriate in *Miller* for lack of employer knowledge, even where the employer was told by plaintiff's sister that plaintiff was mentally "falling apart" and that the family was trying to get her admitted to a hospital, *Miller*, 61 F.3d at 629–630, then on this record Illingworth's symptoms were not sufficiently obvious to reasonably suggest the presence of a disability. *See Stola*, 889 F.Supp. at 136; *cf.* 29 C.F.R. § 1630.9 App. (July 1, 1995).[10] Nestle has established as a matter of law that it lacked (and should not be charged with) knowledge of Illingworth's disability, and thus did not violate the LAD.

 Notwithstanding its broad language, *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993), is not to the contrary. In that case, the New Jersey Supreme Court explained that:

> [t]he LAD is not a fault—or intent—based statute. A plaintiff need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment. The purpose of the LAD is to eradicate discrimination, whether intentional or unintentional. Although unintentional discrimination is perhaps less

morally blameworthy than intentional discrimination, it is not necessarily less harmful in its effects, and it is at the effects of discrimination that the LAD is aimed. Therefore, the perpetrator's intent is simply not an element of the cause of action. Plaintiff need show only that the harassment would not have occurred but for her sex.

132 N.J. at 604–605, 626 A.2d 445. This passage recognizes that the intent of the harasser and his employer are irrelevant to whether workplace conduct and statements create an uncomfortable and hostile environment for a co-worker. By the same token, in disparate treatment cases, proving the employer's wrongful intent or *mens rea* is not necessary since gender, race and handicap stereotyping can evidence discrimination even though the perpetrators may not intend to or even fathom their discriminatory behavior. But the Court does not read *Toys 'R' Us* as altering the essential inquiry, which must always be a search for a causal nexus between an employment decision and an illegitimate consideration. Indeed, recognizing that direct evidence of this causal relationship is exceedingly rare, the New Jersey Supreme Court typically resorts to shifting burdens of production and proof to assist plaintiffs in their quest to persuade the factfinder that consideration of an illegitimate factor caused an adverse employment decision. *See, e.g., Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 660 A.2d 505 (1995); *Grigoletti*, 118 N.J. at 97, 570 A.2d 903 ("In outlining approaches and infusing discrimination claims under LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII … most cogently presented in *McDonnell Douglas Corp. v. Green*."); *Goodman v. London Metals Exchange, Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981). Under both New Jersey and federal law, therefore, the factfinder's ultimate re-

---

10. 29 C.F.R. § 1630.9 App. provides that:
 Employers are obligated to make reasonable accommodations only to the physical or mental limitations resulting from the disability of a qualified individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware. If an employ-

ee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. In general, however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.

sponsibility is to determine whether impermissible stereotyping, harassment or bias intentionally or unintentionally infected the employment decision or environment. Because Nestle lacked knowledge of Illingworth's dyslexia, as a matter of law he cannot establish a causal connection between his dyslexia and his termination.

■■■ Illingworth's failure to make out a prima facie case relieves the Court of the obligation to undertake steps two and three of the familiar *McDonnell Douglas/Burdine* burden-shifting analysis. *See Clowes v. Terminix International, Inc.,* 109 N.J. 575, 538 A.2d 794 (1988). Even were further inquiry necessary, the Court can find no record evidence to cast doubt on Nestle's performance-based rationale for Illingworth's termination. Perhaps this would be a different case if Nestle had known about his dyslexia but disclaimed any reliance upon it when making the decision to fire him. In cases where the employer knew about an employee's disability, courts have properly denied summary judgment when a jury could reasonably infer that the employer's performance justification for its decision was merely a *post hoc* rationalization or pretext for handicap discrimination. *See, e.g., E.E.O.C. v. Kinney Shoe Corp.,* 917 F.Supp. 419 (W.D.Va.1996) (ADA case where plaintiff had epilepsy), *Fritz v. Mascotech Automotive Systems Group, Inc.,* 914 F.Supp. 1481 (E.D.Mich.1996) (same); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga.1995) (ADA case where employee had a back problem). But as has been discussed, Illingworth's deficient performance could not have been a pretext for unlawful discrimination because Nestle did not know about Illingworth's dyslexia until months after his termination. The Court will grant Nestle summary judgment dismissing the LAD claim.

## Breach of Contract Claim

Illingworth claims he is entitled to 12 months severance benefits under Nestle's termination benefits plan. He claims that an implied contract exists between him and Nes-

tle based on representations made in the Employee Resource Policy Manual. *See Woolley v. Hoffmann–La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985); *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 643 A.2d 546 (1994); *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554 (1994). Unlike all the cases cited by Illingworth, which examined whether a good-cause-for-termination requirement could be implied in the employment relationship between employee and employer, the instant *"Woolley"* claim is not for wrongful termination but for wrongful denial of severance benefits. · Since severance benefits are involved, ERISA governs.

■■■ ERISA provides a cause of action under federal law to any participant or beneficiary of a benefit plan to recover benefits due under the plan, if the plan falls within the scope of the statute. *See* 29 U.S.C. § 1132(a)(1)(B).[11] The statute covers two types of plans, pension plans, *see* 29 U.S.C. § 1002(2)(A), and welfare plans. *See* 29 U.S.C. § 1002(1). Welfare plans include any "plan, fund or program" established or maintained by an employer for the purpose of providing certain benefits to the employees or their beneficiaries. Benefit plans providing severance pay are welfare plans within ERISA's ambit, *see Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673–74, 104 L.Ed.2d 98 (1989), even where, as here, the severance benefits are distributed from general company funds rather than a separately established fund. *See Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 325 (2d Cir.1985), *aff'd sub nom, Roberts v. Burlington Industries, Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986).

■■■ Congress intended that ERISA occupy fully the field of employee benefit plans and to establish it "as exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981). Section 514(a) states that it "shall supersede any and

---

**11.** 29 U.S.C. § 1132(a)(1)(B) provides that "a civil action may be brought (1) by a participant or beneficiary ... (B) to recover benefits due to him under the terms of his plan, to enforce his

rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The "relates to" language must be given its normal meaning, which means a state law claim is preempted "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). *Shaw* rejected the view that common law causes of action or state regulatory statutes are preempted only when they attempt to regulate an area expressly covered by ERISA, such as reporting, disclosure and fiduciary responsibilities. *Id.* at 98. Because Illingworth's claim relates to an employee benefit plan, ERISA preempts New Jersey law, and any entitlement to relief is governed by federal law. *See Labus v. Navistar Intern. Transp. Corp.,* 740 F.Supp. 1053, 1065 (D.N.J.1990) (holding preempted promissory estoppel claim regarding entitlement to early retirement benefits).

A denial of benefits under an ERISA plan is reviewed either *de novo* or, where the plan delegates discretionary authority to an administrator or fiduciary to determine eligibility or interpret the plan's terms, under an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Perdue v. Burger King Corp.,* 7 F.3d 1251, 1254 (5th Cir.1993). According to the Third Circuit, a decision is arbitrary and capricious if clearly erroneous or irrational. *See Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1141 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994).

Norm Peebles, Nestle's Director of Human Resources for the Sales Division, states that Nestle reserved the right to interpret and modify the policy, which is administered by the Human Resources Department. *See* Peebles Decl. at ¶ 4. Nestle submits that its reservation of rights means that benefit eligibility determinations are subject to review under an arbitrary and capricious standard, the more relaxed of the two standards of review delineated in *Firestone. See* 489 U.S. at 115, 109 S.Ct. at 956–57. But the actual plan documents containing the reservation of discretion, if such a reservation was made, is not in the record. Nestle merely submits pages from the Human Resources Policies and Guidelines, rather than the plan documents themselves. The Human Resources Policy does not state that Nestle reserves the right to interpret plan terms; instead, it reserves the right to amend or modify the benefits and policies described therein,[12] a different prerogative than at issue in *Firestone*'s lower court progeny. *Cf. Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990) (arbitrary and capricious standard of review appropriate when employee welfare plan states that the decision of the administrator "shall be final and conclusive as to all questions of interpretation and application of these Pension Rules and as to all other matters arising in the administration thereof"). The only evidence of record that Nestle reserved such discretion as to trigger an arbitrary and capricious standard of review is the Peebles Declaration, which itself relies upon the Human Resources Policies and Guidelines. Contrary to Nestle's position in this litigation, the Court finds no record evidence upon which to base a conclusion that Nestle reserved discretion to interpret the plan and determine benefit eligibility. *De novo* review is thus appropriate.

Even applying *de novo* review, the Court will uphold Nestle's denial of severance benefits. The policy relied upon by plaintiff is clearly limited to terminations that result from job elimination, consolidation or displacement, rather than from inadequate performance. There is no dispute that Illingworth was not terminated as part of a corporate downsizing or other structural change that would occasion job attrition. Nor is there any evidence of record that severance benefits flowed to other employees terminated for deficient performance, information that might have suggested that Nestle intended its severance plan to apply more

---

12. "The Company reserves the right to alter, amend, change, or abolish the described policies, procedures, and benefits either at its sole discretion or, where appropriate, at the sole discretion of specific benefit plan administrators." Peebles Decl., Ex. B.

broadly than the Court now interprets it. And although Illingworth notes that his position went unfilled until November 1994, implying that the position was eliminated, a new employee was ultimately placed in Illingworth's position after Nestle determined that a New York area Business Analyst remained necessary. The mere fact that it took several months to reach this decision does not, as Illingworth contends, transform what was clearly a for-cause termination into a scenario that a jury could reasonably construe as a consolidation or reduction in force. Summary judgment is appropriate as to this claim as well. *See Perdue,* 7 F.3d at 1254 (granting summary judgment because for cause termination not covered by plan that limited severance pay eligibility to employees involuntarily terminated in connection with workforce reduction or job elimination plan).

### Conclusion

For the foregoing reasons, the Court will grant Nestle's motion for summary judgment and dismiss this case in its entirety.