John DELCASTILLO and Lois Diane Delcastillo, Plaintiffs,

v.

ODYSSEY RESOURCE MANAGEMENT, INC., a Texas corporation, 1st Odyssey Group, Inc., a Texas corporation, Defendants.

No. 8:01CV342.

United States District Court, D. Nebraska.

June 11, 2004.

Christopher D. Curzon, Dwyer, Smith Law Firm, Omaha, NE, for Plaintiffs.

Kevin S. Dunagan, Robert C. Rice, Rice Law Firm, Houston, TX, Craig F. Martin, Lamson, Dugan Law Firm, Omaha, NE, for Defendants.

## AMENDED MEMORANDUM AND ORDER

BATAILLON, District Judge.

This matter was tried to the court on August 4 and 5, 2003. The following are the court's findings of fact and conclusions of law.

This is an action for damages and equitable relief brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B). Plaintiffs John and Lois Delcastillo contend that defendants Odyssey Management Company and Odyssey Resource Co. (hereinafter referred to collectively as "Odyssey" or "the Odyssey defendants") failed to provide plaintiffs with adequate notice of their rights under COBRA and breached fiduciary duties with respect to health benefits coverage. Plaintiffs seek compensation for their medical expenses as well as statutory penalties. In defense, the Odyssey defendants argue that they had no duty to provide either benefits or COBRA notice because Odyssey was not the plan's sponsor at the time of a "qualifying event" that would have triggered such a duty, and that plaintiff John Delcastillo was not an employee eligible for coverage under the plan.

## FINDINGS OF FACT

Plaintiff John Delcastillo was sixty-five years old at the time of trial, and plaintiff Lois Delcastillo was fifty-eight years old at the time of trial. The evidence adduced at trial shows that Mr. Delcastillo was hired on January 5, 1994, by Houston J–M Corporation d/b/a GLNX. On August 12, 1996, Mr. Delcastillo fell from a railcar, severely injuring himself. He was unable to work after that date and began to collect workers' compensation benefits. Trial Exhibit ("T.Ex.") 59. GLNX continued to provide his health insurance benefits. T. Ex. 100. GLNX was sold to Integrated Rail Products ("IRP") on October 15, 1997. T. Ex. 116.

On June 11, 1997, IRP entered into a Staff Servicing Agreement with Odyssey Management Company to provide employment and human resource services. T. Ex. 26. Odyssey Management Services is a "professional employer organization" that characterizes itself as a "co-employer." On January 1, 1999, IRP entered into another Staff Servicing Agreement with Odyssey Resource Management, Inc., to provide employment and human resource services. T. Ex. 27. Carl Kleimann, President of both 1st Odyssey Group and Odyssey Resource Management, testified that Odyssey had a plan sponsor role in connection with the employment benefits

plans it offered. Under the 1999 Staff Servicing Agreement with IRP, Odyssey was responsible for processing and administering claims and also assumed a contractual obligation to provide appropriate ERISA and COBRA notice to IRP employees "as to any employee benefit plans" it administered. *Id.* IRP chose to switch its employees from United Healthcare to the Odyssey health insurance policy, and on February 1, 1999, the change became effective. 1st Odyssey in turn contracted with Reliance Insurance Company ("Reliance") to provide health insurance coverage and W. Loomis Co. ("Loomis") to administer the plan. T. Ex. 29, 30. Mr. Kleimann testified that an eligibility determination was the duty of Loomis, as administrator. During the period from the date of his injury through February 1999, John Delcastillo's health insurance "Explanation of Benefits" forms, paystubs, W–2 forms, W–4 forms, employee handbook, and employee safety guide listed his employer as Odyssey Resource Management, Odyssey Management Services or 1st Odyssey Group. T. Exs. 49, 50, 51, 61, 62, 63, 64, 81, 97, 98, and 99.

Both Odyssey Resource Management and 1st Odyssey Group operate under the umbrella of the same holding company, Supreme Enterprises, Inc. ("Supreme"). Supreme and its subsidiaries, including Odyssey Resource Management and 1st Odyssey Group, Inc. share the same headquarters address and phone number. 1st Odyssey Group is owned by Carl Kleimann, Patricia Fry, and David Williams. T. Ex. 105. The headquarters building is owned by Mr. David Williams and Ms. Patricia Fry. The building is leased only to 1st Odyssey Group, Inc., yet, Supreme and its subsidiaries, including Odyssey Resource Management, are also tenants. Williams Dep. 20:23–21:13; Fry Dep. 23:9–13. Ms. Fry testified that she did not know what 1st Odyssey Group paid for rent.

David Williams testified that he is the major shareholder and CEO of 1st Odyssey Group, but has turned the day-to-day operations over to its President, Karl Kleimann. He further testified that neither Supreme Enterprises nor Odyssey Resource Management has any employees. Odyssey Resource Management ceased doing business as a professional employer organization because its license was not renewed by the state of Texas. Williams testified that several Odyssey entities went through several more changes over the years, but the ownership never changed. 1st Odyssey Group was also known as ENS Management, Inc. at one time. 1st Odyssey Group was created "to purchase workers' compensation insurance and continue to operate." Williams Dep. 36:1–2, Odyssey Resource Management entered into an agreement with 1st Odyssey Group "to be able to service the clients that were—that had contracts with Resource Management." Williams Dep. 39:15–17. Pursuant to that agreement, 1st Odyssey Group pays Supreme Enterprises $300,000 per month. Mr. Williams is paid $20,000 per month, from 1st Odyssey, through ENS Management, for consulting.

Mr. Kleimann testified that he serves as president of 1st Odyssey Group and as Senior Vice–President of Odyssey Resource Management. He characterized Odyssey Resource Management as a "dormant" corporation. He testified that 1st Odyssey Group acquired certain of Odyssey Resource Management's contracts and paid for them. Deposition testimony admitted at trial shows that employees were transferred from Odyssey Resource Management to 1st Odyssey Group, Inc. (Williams Dep. 40:16–24; Kleimann Dep. 18:17–23) and that 1st Odyssey Group, Inc. uses the same computer system that Odyssey Resource Management and all the other subsidiary companies also use. Kleimann Dep. 95:15–20. Additionally, a

review of the deposition testimony of Mr. Kleimann, David Williams, Patricia Fry, Perry Galium and Mark Turner shows little regard for corporate formalities. The corporate officers demonstrated little understanding of the corporate structure, operations and ownership of the various Supreme subsidiaries and their relationships to each other. Ms. Patricia Fry, Vice President of 1st Odyssey Group, testified that she has been employed by 1st Odyssey Group or Odyssey Management Company since 1989. Although she testified that she did not know whether or not she served on the board of 1st Odyssey Group, Texas franchise reports show her to be an officer of Supreme Enterprises, Inc. and 1st Odyssey Group. She testified that she is compensated through Supreme Enterprises at the rate of $20,000 per month. Mr. Williams testified that Supreme Enterprises derives its only income from fees it received from 1st Odyssey Group, amounting to $300,000 per month. The names "Odyssey Group," "Odyssey Resource Management," "Odyssey Management Services," "Odyssey Management, Inc.," "Odyssey Resource Management II," "Odyssey Services," and "Odyssey Services II" were used interchangeably on various corporate documents and communications.

When he was injured in the work-related injury in August 1996, Mr. Delcastillo suffered a broken pelvis in four places, a brain hemorrhage, a shattered arm and several broken vertebrae in his back. T. Ex. 59. He later suffered a blood clot. GLNX continued to provide him with medical benefits after his injury. T. Ex. 100. He testified that he regarded himself as an employee who was injured. There is no evidence that shows or suggests that Mr. Delcastillo was no longer an employee after his injury. To the contrary, numerous documents show that Mr. Delcastillo continued to be regarded by the Odyssey defendants and GLNX, and later IRP, as

an employee. See T. Ex. 15, 17, 35, 36, 37, and 134.

At the time GLNX was purchased by Integrated Rail Products in November 1997, the benefits manger at Integrated Rail Products wrote to Mr. Delcastillo, stating that GLNX–Omaha had ceased to exist on October 15, 1997, and that all GLNX employees had been terminated at that time. T. Ex. 116. In the letter, Mr. Delcastillo was assured that "Houston J–M Corp. will pay your health coverage until you have reached MMI [maximum medical improvement]." Id. As noted, the Delcastillos continued to receive health insurance benefits without incident through February 1999. Explanation of benefits forms show health coverage was provided by GLNX until October 1997, and then was provided by IRP until Feb. 1, 1999. T. Ex. 100. Mr. Delcastillo's continued status as an employee is also confirmed by IRP's employee list. T. Ex. 18. The evidence further shows that Mr. Delcastillo received workers' compensation checks from an Odyssey entity. Mr. Delcastillo was never informed that it was necessary to take any action in order to continue health insurance coverage nor was he informed that the coverage would terminate.

Mr. Delcastillo was the primary wage-earner for his family. His wife, Lois Diane Delcastillo, was not employed outside the home; she cared for the Delcastillos' son, who had juvenile diabetes. Mrs. Delcastillo has had diabetes since 1953 and is an insulin-dependent, type 1, juvenile-onset diabetic. Because of complications of her diabetes, Mrs. Delcastillo has had two heart attacks and an iliac artery bypass, and suffers from vascular disease, diabetic retinopathy, and hypothyroidism. She was blind in one eye, but that condition was corrected by surgery, and she presently needs surgery in her other eye.

In March 1999, Mrs. Delcastillo first became aware of a problem with health benefits coverage when a pharmacy refused to fill a prescription, stating that she had no coverage. Mrs. Delcastillo testified that she immediately called IRP. An IRP employee informed her that IRP's United Healthcare Plan had been terminated, but that insurance would be provided through a new plan. IRP later realized that John Delcastillo's name had been inadvertently left off a list of employees that had been sent to Odyssey. Mrs. Delcastillo later received a call from Linda Reyna, an Odyssey employee, who confirmed that there had been a mistake but that a health insurance packet would be mailed to the Delcastillos.

On March 18, 1999, the Delcastillos received a fax containing a Reliance Insurance Company enrollment form. T. Ex. 4. The completed form was returned by the Delcastillos and was received by defendant Odyssey on March 29, 1999. T. Ex. 2. On March 20, 1999, the Delcastillos received two health insurance cards and health plan documents. T. Ex. 5. The cards are imprinted "Reliance Insurance Company, Odyssey Resource Management, Inc." *Id.* The employee benefits explanation packet is labeled "1st Odyssey Group." T. Ex. 4. In response to a request, the Delcastillos received a PPO Preferred Provider Directory via Federal Express, on April 7, 1999. T. Exs. 6 & 7. In August 1999, the Delcastillos received a "Certificate of Coverage" showing Odyssey Resource as employer. T. Ex. 9.

The Delcastillos attempted to use the health insurance cards but were informed by health care providers that there was no coverage. Mrs. Delcastillo made multiple calls to Odyssey and to Reliance and Loomis, the insurer and administrator of the plan, and was repeatedly assured that a health care policy covering the Delcastillos was in existence. No medical services

were ever reimbursed and furthermore, no denials of benefits were ever sent to the Delcastillos. In early June 1999, the Delcastillos filed a complaint with the Nebraska Department of Insurance. The complaint was forwarded to Reliance Insurance Company. Reliance responded to the Department of Insurance, stating that insurance existed. T. Exs. 10 & 11. On August 9, 1999, Loomis sent the Delcastillos a certificate of coverage, identifying Reliance as the insurance carrier and Odyssey as the employer. T. Ex. 9. On October 22, 1999, John Delcastillo received a letter from Carl H. Kleimann, Senior Vice–President of Odyssey Resource Management, stating that, although Delcastillo did not have coverage, Odyssey would offer coverage, retroactive to February 1, 1999, until December 31, 1999. The offer was contingent upon a review of claims and a utilization review of future claims exposure as well as the Delcastillos' agreement not to seek COBRA continuance coverage. T. Ex. 12. Mr. Delcastillo did not respond to the letter. He testified that he had been assured that he was already covered and believed that he was. He thought Odyssey's offer did not give him anything. In March 2000, the Delcastillos received a notice from 1st Odyssey Group addressed to them, as "Reliance Insurance participants," that Odyssey's Reliance health and dental plan premiums could increase. T. Ex. 13. On July 20, 2000, the Delcastillos received a letter dated July 17 informing them that their medical coverage was terminated effective June 30, 2000. T. Ex. 14. This letter included notice of Delcastillo's right to elect continuation coverage under CO-BRA. *Id.* The correspondence states John Delcastillo's "affiliation date" was January 5, 1994; his "qualifying event" date was June 30, 2000; the "date coverage began" was February 1, 1999; and

the "date coverage ended" was June 30, 1999. *Id.*

Meanwhile, Mrs. Delcastillo encountered numerous health problems for which she was unable to obtain any insurance payment or reimbursement. Correspondence from health care providers indicates that neither Reliance, Loomis or Odyssey responded to claim submissions. T. Ex. 75, 76, 77, & 78. Submission of claims resulted in neither approval nor denial, only inaction. *Id.* The evidence shows that Loomis, at the direction of PRS, Reliance Insurance Company's program manager, had placed a "hold," or "pended" the claims, due to a dispute over eligibility. T. Ex. 35, 36, & 37. The Delcastillos were never informed of this fact.

Mrs. Delcastillo underwent treatment and ultimately surgery for a sight-threatening eye condition that was paid for by donations from her church and charitable foundations. T. Ex. 104. The evidence further shows that the Delcastillos incurred over $27,026.11 in actual medical expenses during this time. T. Ex. 139 through 158. Ultimately, the Delcastillos divorced so that Mrs. Delcastillo could qualify for public assistance. T. Exs. 124 & 125. The Delcastillos provided evidence that Mrs. Delcastillo is "uninsurable," that is, she cannot obtain private health insurance at any price. She testified that she could not afford the premiums to pay for insurance under the State of Nebraska Comprehensive Health Insurance Plan that provides health insurance for those who cannot obtain coverage elsewhere. T. Ex. 74.

## CONCLUSIONS OF LAW

### I. Alter Ego

■ The evidence shows that the two defendant companies are alter egos of each other and of other entities owned by the parent holding company. Courts evaluating alter ego claims under ERISA should use corporate law principles. *Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.,* 104 F.3d 1050, 1055 (8th Cir.1997). This is a mixed question of law and fact. *Id.* at 1054. Those principles provide that the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only; and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud. *Id.* The essence of the alter ego test is whether, under all the circumstances, the transaction carries the earmarks of an arm's length bargain—if it does not, equity will set it aside. *In re B.J. McAdams, Inc.,* 66 F.3d 931, 937 (8th Cir.1995). In this case, the court finds that it is clear that the defendant corporations do not exist independently of each other; the entities were used to perpetuate the denial of Mr. Delcastillo's notice and benefits and to create confusion about the Delcastillos' recourse and remedies. The interrelationship of the Odyssey defendants and their parent corporation and its other subsidiaries suggests that Supreme and its subsidiaries are a single entity that hides behind legalistic corporate identities and formalities to elude responsibilities for corporate acts. The court finds that to the extent liability is found, it attaches to both defendants as alter egos of each other.

### II. ERISA and COBRA

■ ERISA, as amended by COBRA, imposes a statutory duty on a "plan sponsor" to provide continuation coverage identical to that provided to its current employees. *See* 29 U.S.C. §§ 1002(16)(B), 1161(a), 1162(1); *Fink v. Dakotacare,* 324 F.3d 685, 690 (8th Cir.2003). The fact that a plan sponsor switches its plan from one group health provider to another may modify but not eliminate this duty. *Id.* It

is not a beneficiary's obligation to sort out who provides the coverage. *Id.* A plan sponsor and plan administrator, as ERISA fiduciaries, are responsible to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries ... (A) for the exclusive purpose of: (I) providing benefits to participants and their beneficiaries," 29 U.S.C. § 1104(a)(1); *see Fink,* 324 F.3d at 690 n. 3. An ERISA fiduciary must exercise its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use," 29 U.S.C. § 1104(a)(1)(B). ERISA beneficiaries may obtain appropriate equitable relief to redress a fiduciary's breach of these duties. See 29 U.S.C. § 1132(a)(3); *Fink,* 2003 324 F.3d at 690 n. 3.

▬ As noted, Odyssey is a professional employer organization, known as a co-employer. Under this arrangement, a co-employing company "provides co-employment services to its client employers— designating itself on employees' W–2 forms as the employer, paying employee wages, and providing all employee benefits". *See, e.g., Employers Resource Management Co., Inc. v. Shannon,* 65 F.3d 1126, 1128 (4th Cir.1995). "The primary employer is relegated, in effect, to the status of an on-site director of day-to-day operations." *Id.* A co-employer or professional employer organization can be either the plan administrator and/or ERISA fiduciary of the employee welfare benefit plans that it establishes for the employees of its client co-employers in these circumstances. *Id.* The co-employer generally finances the plans through fees paid by the client co-employers and through employee contributions. *See id.*

Through COBRA, Congress amended ERISA to require that covered group health plans "provide ... that each quali-fied beneficiary who would lose coverage ... as a result of a qualifying event is entitled ... to elect ... continuation coverage under the plan." 29 U.S.C. § 1161(a). COBRA contains provisions that give certain former employees the right to temporary continuation of health coverage for themselves and their families at group rates. *Hartley v. Dillard's Inc.,* 310 F.3d 1054, 1063 n. 4 (8th Cir.2002). "COBRA was enacted in 1986 as a legislative response to 'reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.'" *McGee v. Funderburg,* 17 F.3d 1122, 1124 (8th Cir.1994) (quoting H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.C.C.A.N. 42, 579, 622). In an effort to provide continued access to affordable private health insurance for some of these individuals, COBRA compels employers who sponsor certain group health plans to provide qualified beneficiaries with the option of receiving self-paid continuation coverage for eighteen or thirty-six months after a qualifying event which would otherwise result in termination of coverage. *Id.* ERISA, as amended by COBRA, is remedial legislation that should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans. *Id.*

▬ The continuation of health insurance coverage is an important concern when a person's employment status changes. *See Chesnut v. Montgomery,* 307 F.3d 698, 700 (8th Cir.2002). Thus, providing appropriate notice of COBRA continuation coverage rights is a key requirement under COBRA. *McDowell v. Krawchison,* 125 F.3d 954, 957 (6th Cir. 1997). Notice is necessary "to allow the qualified beneficiary to make an informed

decision whether to elect coverage." *Id.* at 958. COBRA first requires that "the group health plan shall provide, *at the time of commencement of coverage under the plan,* written notice to each covered employee and spouse of the employee (if any) of the rights provided under [COBRA]." 29 U.S.C. § 1166(a)(1) (emphasis added). COBRA also requires that a plan administrator notify any qualified beneficiary of such beneficiary's rights under COBRA *on the occurrence of a qualifying event.* 29 U.S.C. § 1166(a)(4).

 The term "qualifying event" is any of several events, including death, divorce, termination or reduction of hours, that, "but for the continuation coverage required under [COBRA], would result in the loss of coverage of a qualified beneficiary." 29 U.S.C. § 1163. The employer of an employee under a plan is charged with the duty of notifying the administrator of the qualifying events of death, termination, a covered employee's entitlement to Social Security benefits or the employer's bankruptcy, within thirty days of the qualifying event. 29 U.S.C. § 1166(a)(2). Correspondingly, the employee must notify the administrator of the qualifying events of divorce or a dependent child ceasing to be dependent, within thirty days of the qualifying event. 29 U.S.C. § 1166(a)(3). Under COBRA, an ERISA fiduciary must provide written notice to the employee when coverage under a group plan commences, but oral notice can suffice in the case of notice after a qualifying event. See 29 U.S.C. § 1166(a)(1) & (4); *Chesnut,* 307 F.3d at 700. Ordinarily, when a qualifying event occurs, the covered employee has already received an initial written notice of the right to continuation coverage and the second notice is merely a reminder of that right. *Id.* at 701. A plan fiduciary can satisfy its notice obligation by providing information that adequately informs the qualified beneficiary of the coverage he or she was entitled to receive and the

money that he or she owed in order to maintain this coverage. *Id.* The notice given must be sufficient to allow the qualified beneficiary to make an informed decision whether to elect coverage. *Id.* The plan fiduciary bears the burden of proving that he provided sufficient oral notice. *Stanton v. Larry Fowler Trucking, Inc.,* 52 F.3d 723, 727–29 (8th Cir.1995). Whether the notice is sufficient in a particular case is an issue of fact. *Chesnut,* 307 F.3d at 700.

 The plain language of the statute defining "qualifying events" limits qualifying events to those events for which there would be a loss of health insurance but for the provision of COBRA coverage. *See* 29 U.S.C. § 1163; *Williams v. Teamsters Local Union,* 2003 WL 22424726, *4 (N.D.Ill. Oct. 23, 2003) (noting a termination that does not result in a loss of benefits does not constitute a qualifying event and does not trigger the notice requirements of § 1166). After John Delcastillo's injury and resultant inability to return to work, the Delcastillos continued to receive health insurance coverage for over two years. Thus, even if the occurrence of the injury could somehow be characterized as a termination, it would not be a qualifying event. It would defy logic to impose a duty to notify an employee of the right to obtain continuation coverage, generally at a higher price, when coverage remains available for a lesser amount. Accordingly, John Delcastillo's injury in August 1996 cannot be a qualifying event under COBRA. Similarly, the ostensible "termination letter" that John Delcastillo received in November 1997 could not amount to a qualifying event since, by its terms, the letter extended coverage, rather than ended it. *See, e.g., DiGiovanni v. the Guardian Life Ins. Co. of Amer.,* 2002 WL 1477175, *7 n. 4 (D.Ma. June 28, 2002) (finding ERISA fiduciary bound by its pro-

vision of benefits to a disabled employee who met policy definition of "terminated"). There is no evidence that Odyssey ever provided any written notice at the inception of coverage. Similarly, Odyssey did not provide sufficient notice, written or oral, in the case of any qualifying event at any time until it notified John Delcastillo in July 2000 that coverage had terminated. Accordingly, the court finds Odyssey liable for failure to provide the Delcastillos with notice of their rights under COBRA.

The Delcastillos also premise liability on breach of fiduciary duties in connection with Odyssey's handling of the Delcastillos' health care benefits. In response, Odyssey contends that it has no fiduciary relationship with the Delcastillos since the Delcastillos were never eligible under the plan because in order to be eligible, John Delcastillo would have had to work more than thirty hours a week and he did not work at all. The court finds this argument specious. *See DiGiovanni,* 2002 WL at 1477175, *7 (rejecting similar argument). Odyssey contracted to provide human resource and benefits service for IRP's employees. Under the terms of the contract, IRP was to have forwarded a list of covered employees to Odyssey. At least as of the time Mrs. Delcastillo was first assured of coverage, Odyssey was informed that IRP regarded John Delcastillo as an employee. Whatever responsibility IRP bears for this debacle remains to be sorted out between IRP and Odyssey. It is not the beneficiary's obligation to sort this out. *See Fink,* 324 F.3d at 690. Odyssey ignores its status as "co-employer," with resultant duties as employer under ERISA to notify plan administrators. Moreover, Odyssey admits that it is the "Plan Sponsor." Odyssey's attempt to transfer responsibility for its fiduciary duties to Loomis, Reliance, or PRS ignores the evidence that these entities operated as Odyssey's agents in connection with the health insurance plan that Odyssey spon-sored as co-employer. In exchange for the payments under the contract administering its client co-employers' health benefits plans, Odyssey assumed the risk of, and liability for, malfeasance in connection with administration of those plans vis-a-vis employee beneficiaries. Accordingly, the court finds that plaintiffs have shown that Odyssey breached its fiduciary duties in connection with the administration of the plan.

Alternatively, the court finds this case an appropriate candidate for application of the doctrine of equitable estoppel. An employer can be liable in its fiduciary capacity under ERISA for making affirmative misrepresentations on both breach of fiduciary duty and on equitable estoppel theories. *See, e.g., Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226 (8th Cir.1994) (finding an equitable estoppel authorized under ERISA pursuant to § 1132(a)(3)(B)); *see also Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1298 (3d Cir.1993) (holding that § 1132(a)(3)(B) authorizes the award of appropriate equitable relief to a beneficiary for violations of ERISA). To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. *Curcio,* 33 F.3d at 227. The determination of an equitable estoppel claim is a mixed question of law and fact. *Id.* Odyssey does not dispute the essential facts of this case. The Delcastillos have shown that the Odyssey defendants, through either their agents or client co-employers, represented to the Delcastillos that the Delcastillos were covered under a policy of health insurance, when, in fact, they were not. This misrepresentation was, of course, material in that it affected an important component of their employer-spon-

sored health plan, in fact the central or only component—coverage for health care. The Delcastillos, in reliance on Odyssey's representations, forewent opportunities to obtain insurance elsewhere. Because the Delcastillos had continued to be covered for more than two years after John Delcastillo's disabling accident, in spite of the fact that he had not worked at all, it was reasonable for them to assume such coverage would remain in effect. Undeniably, the Delcastillos relied to their detriment. Had they not been assured of coverage through Odyssey, they could have attempted to provide for it in John Delcastillo's workers' compensation settlement. The court has no difficulty concluding that the Delcastillos have suffered an injury in giving up an opportunity to accommodate their insurance needs through other means, albeit difficult, because of their reasonable reliance on Odyssey's representations. Lastly, the Delcastillos have established the existence of extraordinary circumstances. *See, e.g., Curcio,* 33 F.3d at 227–28 (finding extraordinary circumstances in case presenting far less egregious actions in connection with denial of life insurance benefits after a "roller-coaster" of repeated assurances of coverage).

The court thus finds defendants jointly and severally liable for breach of fiduciary duty, failure to provide written notice of COBRA benefits and rights at the time of commencement of coverage under the plan as required by 29 U.S.C. § 1166(a)(1), and failure to notify the Delcastillos on the occurrence of a qualifying event as required by 29 U.S.C. § 1166(a)(4).

### III. Damages

■ COBRA provides that "the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(3). Courts have interpreted "other relief" as an award of medical expenses minus deductibles and premiums. *See Jones v. Officemax, Inc.,* 38 F.Supp.2d

957, 960 (D.Utah 1999). ERISA remedies include a provision that an administrator who breaches this duty "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day." 29 U.S.C. § 1132(c); *Geissal,* 338 F.3d 926, 933 (8th Cir.2003). The issue under 29 U.S.C. § 1132(c) is whether the plan administrator gave a proper notice, not whether the employee was improperly denied COBRA continuation coverage. *Id.* Damages for failure to give notice can be measured in this case in two ways: damages for failure to give notice of rights and benefits at the commencement of the plan, and failure to give notice on the occurrence of a qualifying event. Although an "employer's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty," neither a defendant's good faith nor the absence of actual injury to the plaintiff precludes the award of a statutory penalty. *Chesnut,* 307 F.3d at 703–04. The correspondence of July 17 was the first document to provide COBRA coverage.

■ There is some evidence that Odyssey's initial failure to provide coverage or notice was the result of a "mix-up" or failure of communication, and not bad faith; nevertheless, its failure to act to remedy the situation, in spite of the Delcastillos' repeated phone calls, as well as its continued reluctance to admit any responsibility for the Delcastillos' predicament, could be considered bad faith. *See, e.g., Brown v. Aventis Pharmaceuticals, Inc.,* 341 F.3d 822, 829 (8th Cir.2003). Additionally, the Delcastillos have shown not only the loss of health benefits, but significant hardship and disruption in their personal and family lives as a result of Odyssey's lapses. Accordingly, the court finds that an award of statutory penalties is appropriate in this case.

Odyssey argues, in connection with damages, that the Delcastillos are not entitled to damages since they cannot show that they could have afforded COBRA continuation coverage even if they had been notified of their right to elect coverage. The court rejects Odyssey's invitation to engage in an after-the-fact, speculative inquiry as to whether the plaintiff could have afforded COBRA coverage. *See Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1385 (10th Cir.1997) (stating "[i]t is entirely conceivable that, faced with the choice of paying the premiums or going without medical insurance altogether, plaintiffs could have borrowed money, sold assets, or found some other way to pay premiums"). *Id.* at 1385. The court's concern rests with whether the plaintiffs were provided an opportunity to elect coverage based upon having been fully informed of their COBRA rights. *See id.* The Delcastillos clearly were not provided any such opportunity. A plaintiff does not need to demonstrate harm to be entitled to damages under 29 U.S.C. § 1132(c). *See, e.g., Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1148 (3d Cir.1993) (involving the analogous area of reporting and disclosure requirements and noting that Congress' purpose in enacting the ERISA disclosure provisions was to ensure that an individual participant knows exactly where he stands with respect to the plan).

The amount of statutory penalties, and the appropriate period of time for which they should be assessed remains to be determined. Plaintiffs have proposed twelve different scenarios, with requested damages amounts varying from $27,026.11 (representing actual medical expenses) to $624,000 (representing actual damages plus maximum statutory penalty damages for the longest period of time that COBRA benefits would arguably be available). The court finds that damages for breach of fiduciary duty and failure to give COBRA notice are the same. Thus, a single damage award will remedy both violations. The court finds an award of damages in the amount of $306,866.11 is appropriate under the circumstances of this case. That amount represents plaintiffs' special damages plus statutory penalties in the amount of $110.00 per day for each plaintiff for either breach of fiduciary duty or failure to provide COBRA notice measured from February 1, 1999, until July 19, 2000, when the Delcastillos received the delayed notice, and for 18 months thereafter, plus statutory penalties in the amount of $110.00 per day for each plaintiff for failure to provided notice of COBRA rights measured from February 1, 1999, until August 10, 1999.

COBRA's civil enforcement statute also provides for an award of attorney fees and costs. The court "in its discretion may allow reasonable attorney fee and costs of the action to either party." 29 U.S.C. § 1132(g). The court finds attorney fees in this case are appropriate and will enter an order assessing fees on a proper showing.

Accordingly,

IT IS ORDERED:

1. The court finds defendants Odyssey Management Co. and Odyssey Resource Co. jointly and severally liable to plaintiffs John Delcastillo and Lois Delcastillo for breach of fiduciary duty under ERISA and for failure to provide notice under COBRA, in the amount of $306,866.11. Judgment will be entered in a separate order after resolution of attorney fees.

2. Plaintiffs are granted until June 7, 2004, to submit a motion for attorney fees.